T.C. Memo. 2003-171

UNITED STATES TAX COURT

FAWZI AND DOLORES TAY TAY ASSAAD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12401-00.                    Filed June 11, 2003.

<u>Benjamin W. Gale</u>, for petitioner.

<u>Christian A. Speck</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioners' Federal income taxes, an addition to
tax, and penalties:

|      |            | Addition to tax and penalties | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
|------|------------|-----------------|--------------|
| 1996 | $3,221     | –               | $644.20      |
| 1997 | 94,904     | $23,595.25      | 18,980.80    |

The only issues are:  (1) Whether petitioners are entitled to a net operating loss carryforward, from 1992 to 1996 and 1997, in an amount exceeding that allowed in the notice of deficiency; and (2) whether petitioners are liable for the section 6651(a)(1)[1] addition to tax for 1997 and the section 6662(a) accuracy-related penalties for 1996 and 1997.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[2]

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this

---

[2]We note that our resolution of the issues in this case has been made more difficult by petitioners' failure to comply with our Rules regarding the form and content of briefs. Our Rules require that proposed findings of fact be complete and that they "consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law." Rule 151(e)(1). Petitioners' entire proposed findings of fact consist of the following:

1. The respondent's mailing of an audit appointment letter to petitioners on or about July 16, 1998, to petitioners at Unionstone Lane, San Rafael, California, did not "commence an examination" of the petitioners' 1996 tax return within the meaning of IRC Sec. 7491. (See Exhibit 10-R)

2. The respondent did not otherwise "commence an examination" of the petitioners' 1996 tax return within the meaning of IRC Sec. 7491 before July 22, 1998.

3. The petitioners presented credible evidence of a net operating loss carryforward to 1996 at least sufficient to reduce to zero the amount of income tax owed for 1996.

4. The petitioners presented credible evidence of a net operating loss carryforward to 1997 at least sufficient to reduce to zero the amount of income tax owed for 1997.

5. The burden of proof shifted to the respondent with respect to the factual issues underlying the proposed deficiencies for 1996 and 1997.

6. The respondent failed to meet his burden of proof with respect to the evidence presented in support of the net operating loss carryovers to 1996 and 1997.

7. The petitioners owe no penalties for 1996 and 1997.

reference.  At the time of filing the petition, petitioners resided in Novato, California.

Mr. Assaad was a real estate developer and investor.[3]  On or about December 8, 1988, petitioners purchased approximately 2.2 acres of land in Atherton, California, which consisted of three parcels:  3, 9, and 15 Isabella.  Mr. Assaad intended to develop the three parcels by constructing three residential homes for sale.  Pacific Bank (Pacific) lent $1.46 million to Mr. Assaad (the land loan) for the purchase of the land.  The land loan was secured by a deed of trust covering the three parcels of land.

On July 29, 1989, Pacific lent Mr. Assaad $2.64 million under a construction loan agreement (the Pacific construction loan) for two of the units in the Atherton project, 3 and 15 Isabella.  A deed of trust in favor of Pacific was recorded with respect to the two parcels.[4]  Mr. Assaad signed a promissory note and executed a guaranty of completion and performance in favor of Pacific for the construction loan.  The note provided for an initial interest rate of 12.5 percent and a variable interest rate on the basis of "an index which is THE PACIFIC BANK GUIDANCE RATE".  A 12-month interest reserve of $228,000 was included in

---

[3]Mr. Assaad was also the sole shareholder of Golden Sunset Homes, Inc., which owned a residential care home, Hopkins Manor.

[4]The loan was also collateralized with a deed of trust of $1.5 million with respect to Hopkins Manor.

the loan commitment. On May 15, 1990, the Pacific construction loan was increased to $2.96 million.

On March 7, 1991, Pacific lent petitioners an additional $320,000 (the $320,000 loan).[5] Also, on or about March 7, 1991, Pacific lent Mr. Assaad $250,000 (the $250,000 loan) secured by a bank guaranty that Mr. Assaad's brother posted through Credit Suisse. A portion of this loan was made in renewal of a prior loan of $150,000. On January 21, 1992, petitioners executed a promissory note to Pacific of $350,000 for a loan that Pacific made to petitioners (the $350,000 loan).

At some point in 1992, the house at 3 Isabella was sold for $1,295,800, and the principal amount due on the Pacific construction loan was reduced to $1.95 million. Mr. Assaad was unable to sell the residence at 15 Isabella, and, in 1992, Pacific sold the property through foreclosure. The trustee's deed states that the amount of consideration was $1.47 million, and the amount of unpaid debt was $2,052,385.23. There were no bidders at the foreclosure sale, and the property went to Pacific.

On or about August 14, 1989, First National Bank of Daly City (First National) lent Mr. Assaad $875,000 (First National

---

[5]Petitioners, as borrowers, Pacific, as lender, and Golden Sunset Homes, Inc., as grantor, executed a commercial pledge agreement with respect to the $320,000 loan. Golden Sunset Homes, Inc., granted Pacific a security interest in a certain note and deed of trust it held.

loan).  Mr. Assaad signed a deed of trust in favor of First National, which secures 9 Isabella as collateral for the First National loan.[6]  On or about April 17, 1990, First National lent Mr. Assaad an additional $100,000 (additional First National loan).  Mr. Assaad signed a deed of trust in favor of First National, which secures 9 Isabella as collateral for this loan.[7]  At some point, California Federal Savings and Loan Association (California Federal) lent money to petitioners to repay the loans from First National, and for other purposes.[8]  On October 31, 1990, California Federal recorded a deed of trust and assignment of rents that petitioners executed in favor of California Federal and against the real estate at 9 Isabella.  A statement from California Federal to petitioners, dated March 9, 1992, states that the total interest paid on a certain loan no. 10743062 for 1991 was $113,812.35.  At some point in 1992, the house at 9 Isabella was sold for $1,250,000.[9]

Petitioners filed joint Federal income tax returns for their 1992, 1996, and 1997 taxable years.  They attached a Schedule C,

---

[6]The construction trust deed cites a note of $875,000, which contains a variable interest rate.

[7]The deed of trust cites a note of $100,000, which contains a variable interest rate.

[8]Petitioners received $120,802.70 cash back on this refinancing transaction.

[9]Petitioners were paid $131,514.95 of the proceeds from the sale of 9 Isabella.

Profit or Loss From Business (Sole Proprietorship), to their joint return for 1992 reporting a loss of $1,890,682 for Mr. Assaad's real estate development business. Petitioners reported gross receipts of $2,675,272, cost of goods sold of $2,226,664, and a gross profit of $448,608 for that business. Petitioners claimed expenses of $2,339,290 (separate from, and in addition to, the cost of goods sold). Petitioners did not report sufficient income on their 1992 Form 1040, U.S. Individual Income Tax Return, from which to deduct the entire loss. They carried forward the loss to their 1993, 1994, 1995, 1996, and 1997 taxable years. On petitioners' 1996 and 1997 Forms 1040, they claimed net operating loss (NOL) carryforward deductions which reduced their taxable income to zero for those taxable years.

In computing the gross receipts from the development business for 1992, petitioners did not report any of the proceeds from the foreclosure sale of 15 Isabella on the 1992 return. The gross receipts from that sale in 1992 were at least $2,052,385.

For many years, Roy Hunt prepared petitioners' tax returns, and he was their accountant. At some point, Anthony Lopez took over Mr. Hunt's practice, and he became petitioners' tax return preparer and accountant about a year before Mr. Hunt's death. Mr. Lopez could not recall whether he prepared petitioners' 1992

tax return.[10] Mr. Lopez testified that whatever records relating to petitioners that were in Mr. Hunt's office were left there following his death. He also testified that Mr. Assaad's records were returned to him as far as he knew and that he does not withhold records in his practice "Even if they don't pay you." Mr. Lopez also represented petitioners in the audit of their 1992 tax return. He testified that he experienced difficulty assembling petitioners' records for substantiation of expenses and other costs, including interest, in part because of Mr. Hunt's death and in part because of Mr. Assaad's lack of cooperation.

In 1993, petitioners purchased, and began to rent out, property known as St. Rose Manor. Petitioners overstated depreciation deductions with respect to St. Rose Manor by at least $148,747 for 1993, $324,033 for 1994, $324,033 for 1995, and $324,033 for 1996, a total of $1,120,846 over the 4-year period. Petitioners' overstatement of the depreciation deductions in 1993, 1994, 1995, and 1996, when corrected, reduces the amount of the NOL carryforward available for 1996 and 1997.

_____

[10]Mr. Hunt continued to work with Mr. Lopez, and he handled all the clients he previously serviced. Mr. Lopez testified that he thought Mr. Hunt was handling petitioners' returns when he died, but he could not be certain. Mr. Lopez signed petitioners' return for the 1992 taxable year; however, he was unsure whether he or Mr. Hunt prepared that return. Mr. Hunt and Mr. Lopez did not prepare any of petitioners' returns for years after the 1992 taxable year.

Petitioners' Federal income tax returns for 1996 and 1997 were filed on October 20, 1997, and January 6, 2000, respectively.  Mr. Assaad could not offer any explanation as to why the 1997 return was filed untimely.  Respondent audited petitioners' 1996 return.[11]  On July 16 or 17, 1998, respondent mailed to petitioners an audit appointment letter with respect to their 1996 taxable year.  The record does not reflect when respondent commenced an examination regarding petitioners' 1997 taxable year.

In computing the NOL carryforward from 1992, respondent determined that petitioners should have reported foreclosure income of $2,052,385 with respect to 15 Isabella in addition to the $448,608 gross profit that they reported on their 1992 return.  He made no adjustments to the $2,226,664 cost of goods sold that petitioners reported.  Respondent revised petitioners' income from the real estate development business to $2,500,993. He disallowed $369,023 of the expenses that petitioners claimed on their 1992 Schedule C, but he allowed $915,002 of additional expenses not originally shown on petitioners' 1992 return.

---

[11]Respondent previously audited petitioners' 1992, 1993, 1994, and 1995 tax returns.  Respondent disallowed the NOL carryforward deductions for 1993, 1994, and 1995.  However, petitioners petitioned the Tax Court.  Respondent represents that he "settled the Tax Court case for no deficiency on the basis that some net operating loss existed and to the extent it existed, it was sufficient to eliminate all of the petitioners' income and income tax liability for those years."

Respondent computed an NOL of $391,243 for 1992, which he allowed as carryback and carryforward deductions for petitioners' 1989, 1990, 1991, 1993, 1994, 1995, and 1996 taxable years. After accounting for the adjustments to the NOL carryforward deductions and the depreciation deduction for 1996, as well as other items, respondent determined deficiencies of $3,221 for 1996 and $94,904 for 1997.

OPINION

This case involves the question whether petitioners are entitled to NOL carryforward deductions for 1996 and 1997 in amounts greater than those which respondent allowed in the notice of deficiency. To decide that issue, we must determine whether petitioners have adequately substantiated their claimed costs and expenses in their construction project for purposes of computing the NOL for 1992.

A. Net Operating Loss Carryforward Deductions

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining his tax liability, the Commissioner shall have the burden of proof with respect to that issue. Sec. 7491(a)(1). Section 7491 was added to the Code by

the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 726, and is applicable in the case of court proceedings arising only in connection with examinations commencing after July 22, 1998, RRA 1998 sec. 3001(c), 112 Stat. 727. In the instant case, respondent selected petitioners' 1996 return for audit and mailed to petitioners notice of that audit on July 16 or 17, 1998, before the effective date of section 7491. Absent any contrary evidence, we treat that date as the date the examination of petitioners' 1996 taxable year commenced. See Jombo v. Commissioner, T.C. Memo. 2002-273; see also H. Conf. Rept. 105-599, at 242 (1998), 1998-3 C.B. 747, 996. There is nothing in the record which establishes that the "examination" of petitioners' 1997 taxable year commenced after July 22, 1998. Petitioners did not present any argument on brief regarding when an "examination" commenced with respect to that year. We hold that section 7491 is not applicable with respect to petitioners' 1997 tax liability. See Castro v. Commissioner, T.C. Memo. 2001-115; Nitschke v. Commissioner, T.C. Memo. 2000-230.

Even if the examination of petitioners' 1996 and 1997 taxable years started after the effective date of section 7491, the burden of proof would not have shifted to respondent. Section 7491(a)(1) applies with respect to an issue only if "the taxpayer has complied with the requirements under this title to

substantiate any item" and "the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2)(A) and (B). For reasons discussed in more detail below, petitioners failed to comply with the applicable substantiation requirements, and they have failed to maintain all required records with respect to their expenses in the Atherton project.

Taxpayers are required to keep such permanent records as are sufficient to substantiate the amount and the purpose of any deductions. Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs. Petitioners have failed to substantiate the vast majority of the expenses that they rely upon to compute the 1992 NOL.

1. Land Purchase and Related Expenses

Petitioners claim that they paid a total of $2,017,397.50 to purchase the land used for the Atherton project, consisting of the following:

| Item | Amount |
|---|---|
| Land loan | $1,460,000.00 |
| Deposit from Assaad savings | 422,397.50 |
| Deposit paid outside escrow | 200,000.00 |
| Advance by Trudell & Coghan | (200,000.00) |
| Credit for amount paid before escrow | 141,125.08 |
| Interest portion of this Credit | [1](6,125.08) |

[1]Petitioners do not explain how they arrived at this figure; however, the buyer's closing statement for the Atherton properties shows interest of $10,722.60. The credit is $130,402.48 apart from the interest.

Petitioners have substantiated to our satisfaction that they borrowed $1.46 million from Pacific to purchase the 3 parcels of land. However, petitioners have not established that they paid $2,017,397.50, as they claim on brief.

When counsel for Mr. Assaad asked him at trial whether he put any money into the project other than the loan amounts, Mr. Assaad testified that "We put our money in there" but that he could not "remember exactly". There is also evidence that other parties may have invested in the Atherton project. Indeed, at trial, Mr. Assaad testified that the Atherton project's general contractor, Rick Trudell, and a friend of Mr. Assaad's, Hayden Coghan, each contributed $200,000 into the Atherton project.[12] Mr. Assaad testified:

    Q    And then the $200,000 for deposit retained, paid outside.

    A    We borrowed that from Rick Trudell.

    Q    Okay.

    A    Okay. Because he wanted to be like a partner in the project.

    Q    Did you pay it or did he pay it?

---

[12]Mr. Assaad could not remember whether Mr. Trudell also got a $200,000 line of credit to be put towards the Atherton properties.

A    He give it to me and I pay it, I think.  And then maybe I pay $100,000 from Mr. Hayden, Coghan.  That's the right name.  And then $100,000 from Rick.  And we kept that $200,000 to pay the City and the architect. * * *

*    *    *    *    *    *    *

A    * * *  Mr. Hayden and Rick Trudell and me, I believe that will make some arrangement, I build that money, the $422,000 from my own bank account.  The deposit that we pay out of escrow I believe, it be between Rick Trudell $100,000, he give $200,000.  We kept another $100,000, and another $200,000 get from Mr. Coghan Hayden, who live in Half Moon Bay.  And then we complete the deal.

        In order to get the bank after that to look, and construction loan, and that was our agreement at that time.

Mr. Assaad later testified to an oral agreement with Mr. Trudell and Mr. Coghan with respect to these amounts.  He testified that he planned to "give everyone his money plus 100 percent" when the properties were sold.  He also testified that Mr. Trudell was "Not exactly" a partner with him with respect to the Atherton project, because there was no written agreement or contract. Given Mr. Assaad's testimony, there is evidence that Mr. Trudell and Mr. Coghan contributed at least $400,000 to the Atherton project.

        Petitioners contend that those contributions were loans. However, Mr. Assaad testified that Mr. Coghan did not receive any of his money back, and Mr. Trudell received only $100,000, but "he said that he doesn't want anymore."  To the extent the amounts from Mr. Trudell and Mr. Coghan were loans and were

forgiven, those amounts represent income that reduces dollar for dollar any amount used in computing the NOL.  Thus, whether the amounts that Mr. Trudell and Mr. Coghan contributed were loans that were forgiven,[13] or amounts those parties invested in the project, petitioners have not established that they paid those amounts into the project.[14]  As such, petitioners have substantiated $1,812,799.98[15] as amounts that they paid into the land purchase.

 2.  Costs in Selling 3 and 9 Isabella

Petitioners substantiated to our satisfaction that they incurred $60,634.76 in closing and settlement costs with respect to the sale of 3 Isabella.  The record also reflects that $100,000 was paid to Mr. Trudell to release his lien with respect

---

[13]We have given Mr. Assaad credit for the $100,000 that was paid to Mr. Trudell.  See infra.

[14]One of respondent's primary contentions on brief is that Mr. Assaad and Mr. Trudell, and perhaps Mr. Coughan, were engaged in a partnership and that petitioners have not shown that the costs and losses resulting from the Atherton houses belonged to them as opposed to other partners.  Although there is some evidence in the record which might suggest a partnership between Mr. Assaad and Mr. Trudell, the evidence is not sufficient for us to conclude that there was a partnership.  Further, there is no basis in the record for allocating the costs and losses to the other alleged partners and for making adjustments, if any, to the amounts realized from the sale and foreclosure of the Atherton properties.

[15]This amount is equal to the $1.46 million land loan plus the $422,397.50 deposit or earnest money, plus the $130,402.48 credit for the amount paid before escrow plus the $200,000 deposit retained, and minus the $400,000 received from Mr. Trudell and Mr. Coghan.

to 3 Isabella and, as Mr. Assaad claims, to repay a portion of Mr. Trudell's prior loan or contribution. Petitioners have also substantiated that they paid $26,657.58 with respect to the sale of 9 Isabella.[16] Petitioners substantiated the following miscellaneous sales costs for 3 Isabella: (1) A home warranty expense of $275, and (2) prorated taxes of $674.36.

Petitioners did not substantiate the remaining amounts that they claim as miscellaneous sales costs for 3 Isabella. Those amounts represent a "credit to buyer" of $1,445 for a fence and a "credit to buyer" of $565 for downspouts as part of the sale of 3 Isabella. Petitioners did not establish that those expenses were actually incurred to the extent claimed. Petitioners, likewise, did not substantiate the $63,000 they claim as expenses for "Fence, chandeliers, etc." Petitioners rely on a handwritten document that a representative of Pacific prepared as evidence of these expenses. That document fails to properly substantiate the amounts petitioners claim. There is no evidence that petitioners actually incurred those expenses in the amount claimed.

3. Foreclosure Expenses (15 Isabella)

Petitioners claim that they incurred $102,385.23 as foreclosure expenses. Petitioners rely on two documents to

---

[16]We note that $11,482.95 of this amount represents interest from Mar. 1 to Apr. 7, 1992. Pursuant to our discussion, which follows, this amount would have to be reduced to account for the portion of the loan from California Federal which petitioners have failed to establish as deductible expenses.

substantiate this alleged expense.  The first document dated January 24, 1992, shows an unpaid principal balance on the Pacific loan of $1.95 million.  The second document dated December 2, 1992, shows the amount of unpaid debt as $2,052,385.23.  Petitioners surmise that the difference in the two amounts must constitute foreclosure expenses.  We disagree. Petitioners have not established to our satisfaction that the difference represents expenses which offset the amount realized on the foreclosure of 15 Isabella.

　　4.　Construction Expenses

The vast majority of the expenses which petitioners claim with respect to the 1992 NOL relate to the costs of construction in the Atherton project.  Petitioners have failed to produce any records which directly substantiate any of those construction expenses.  Instead of producing direct evidence of those expenses, petitioners rely on indirect evidence.  They seek to use the amounts of the various construction and other loans as a proxy for estimating the amount of the construction expenses.

If the taxpayer fails to keep adequate records but the Court is convinced that deductible expenditures were incurred, the Court should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making.  Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930); Shea v. Commissioner, 112 T.C. 183, 187 (1999); see also

Sandoval v. Commissioner, T.C. Memo. 2000-189 (we may estimate basis). However, there must exist some reasonable evidentiary basis upon which to make such an estimate. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985); Edwards v. Commissioner, T.C. Memo. 2002-169.[17]

Except with respect to the interest reserves which were set up with respect to those loans, petitioners claim that the entire amounts of the loans represent expenses that are deductible or which add to their basis in the Atherton project. Petitioners contend that their position is based on the common sense that "construction loans are not distributed until and unless the builder proves that the applicable work has been done".

As a general matter, we might agree that the Atherton project gave rise to deductible expenses or expenses that increased basis. The testimony of Richard X. Waters, vice president of Pacific, Allan Butler, Pacific's jobsite inspector, and Jimmy Dean Black, an employee of First National, indicates

---

[17]Under sec. 274, certain business expenses are subject to more stringent substantiation rules. Those business expenses include traveling expenses, entertainment expenses, meal expenses, and expenses with respect to certain listed property such as passenger automobiles. Secs. 274(d), 280F(d)(4). The rules under sec. 274 supersede our discretion to estimate expenses under the doctrine of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969). We cannot discern from the record, and petitioners have not shown, what amounts of the various loans, if any, represent the type of expenses covered by the rules of sec. 274.

that a significant portion of the Pacific construction loan and the First National loans went into the Atherton project. However, we cannot agree with the assumption inherent in petitioners' indirect method of reconstructing those expenses, that the entire amounts of the construction loans represent deductible expenses. Thus, we cannot agree that petitioners' reliance on the construction loans provides a rational basis for estimating the amount of those expenses.

There is evidence that Mr. Assaad received some of the loan proceeds as direct disbursements. Indeed, Mr. Assaad testified:

> The construction guy, Trudell, do the computer run and then every month we do development, and we go to the two bank and we said: We develop $150,000 here, $100,000 debt.
>
> They pay us. We pay all the subcontractor. We pay all the labor. We have 49 people working on those three houses, every day, six days a week.
>
> Q    Did you ever write checks?
>
> A    Of course we have write checks, yes.

Petitioners did not produce any checks or any other comparable evidence showing the amount of the loan proceeds that was paid into the project. Further, Mr. Assaad received cash back on at least one of the loan transactions involved in this case: He received $120,802.70 cash on California Federal's refinancing of the First National Bank loans. Although petitioners do not rely on that amount to estimate their construction expenses, the fact that Mr. Assaad received cash directly on that loan suggests that

there may have been additional amounts advanced to Mr. Assaad, which we cannot state with certainty were applied to the Atherton project as deductible expenses.

We might agree that, in certain circumstances, construction loans might provide a basis for estimating deductible expenses or basis. However, petitioners have not established to our satisfaction that all the loans that they rely upon herein were construction loans. Mr. Assaad's general testimony and his specific testimony with respect to the First National loans did not assist petitioners in substantiating their construction expenses or otherwise convince us that the various loans provide a rational evidentiary basis for estimating their expenses. Indeed, with respect to the additional First National loan of $100,000, Mr. Assaad testified that he could not remember what this additional loan was for or "anything".

Further, petitioners have not established that the usual formalities for advancing funds on construction loans were followed with respect to each of the loans that petitioners rely upon. With respect to the loans from First National, Mr. Black testified generally regarding the formalities followed with respect to construction loans. However, he could not recall the specifics of the loans to Mr. Assaad or Mr. Assaad's actual association with those loans. The record does not reflect, and petitioners did not introduce any evidence, regarding any

inspection and advance process with respect to the First National loans. Mr. Black's testimony and the evidence of record do not preclude the possibility that some portions of the loans to Mr. Assaad were set up as an interest reserve. In a case like that, allowing interest deductions on the basis of other evidence in the record might result in a double-counting of those expenses.

Petitioners rely on several loans which are not construction loans. Those loans are fully secured with property other than the Atherton real estate. After examining the evidence of record with respect to those loans, we are not convinced that they provide a rational basis for estimating the expenses they purportedly represent under petitioners' method of reconstruction. Further, we are not convinced that those amounts were used in their entirety to pay construction expenses in the Atherton project. Indeed, it appears plausible, and with respect to some of the loans it is clear, that the loan proceeds may have been used to pay interest on the Pacific construction loan. In that case, and since petitioners claim to have paid interest with funds other than those loan proceeds, there could result in a double-counting of interest expenses.

Pacific prepared a document entitled "Loan Credit Memorandum" which indicates that the $320,000 loan was earmarked in its entirety for payment of $160,000 of past due interest on, and an additional $160,000 interest reserve for, the Pacific

construction loan.  Petitioners claim the entire amount of this loan as expenses in computing the NOL for 1992.  However, in their opening brief, they claim that interest expense was paid on the Pacific construction loans in excess of the interest reserves set up therein and according to Federal "G" rates.  Again, petitioners' method of reconstruction fails to preclude the possibility of a double-counting of expenses.  Further, this loan was secured by a pledge of a note and a deed of trust from Golden Sunset Homes, Inc., petitioners' wholly owned corporation.  There is evidence in the record that the interest obligations to Golden Sunset on the note were assigned to the bank, and those interest payments may have been credited against petitioners' obligations on the Pacific loan.  Petitioners did not report the pledge of the note, the deed of trust, or any interest payments as corporate distributions or dividends.  In any event, there is no evidence in the record showing whether this loan was repaid.

With respect to the $250,000 loan, a portion of that loan represents the renewal of an existing loan of $150,000.  There is nothing in the record showing that the prior loan was paid into the Atherton project.  Documents from Pacific indicate that $90,000 of the $250,000 loan was earmarked for the payment of outstanding material and subcontractor bills.  However, those documents are insufficient substantiation of those expenses.  Petitioners have failed to provide a reasonable basis for

concluding that any amount of the $250,000 loan was paid into the Atherton project. Any interest reserve in that loan has likewise not been shown to be deductible.

With respect to the $350,000 loan, petitioners on brief indicate that $212,000 of this loan was used to pay off the remaining amount of the $250,000 loan. For the reasons mentioned above, that portion of the loan would not be deductible. With respect to the remaining portion of that loan, $138,000, there is no documentary evidence showing that amount represents deductible expenses paid into the Atherton project. Petitioners rely on a letter from Mr. Assaad to Mr. Waters and a handwritten note from another representative of Pacific. However, those items indicate only that the remaining amount of the $250,000 loan was increased to $350,000. They do not take the further step of substantiating the increase as deductible expenses.

We are mindful that there must be sufficient evidence contained in the record to provide a basis for us to make an estimate and to conclude that a deductible expense was incurred in at least the amount to be allowed. Pratt v. Commissioner, T.C. Memo. 2002-279. We are not required to guess with respect to the amount of deductible expenses. Norgaard v. Commissioner, 939 F.2d 874, 879 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-390; Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). In the instant case, we bear heavily

against petitioners as we must.[18]  Petitioners have not shown a reasonable basis for concluding that any amount of the $320,000 loan, the $250,000 loan, and the $350,000 loan represents deductible expenses.  With respect to the Pacific construction loan and the First National loans, we are not convinced that the full amounts of those loans were paid into the project and are deductible.  Given the circumstances of this case and the inexactitude apparent from petitioners' evidence, we have no reasonable evidentiary basis to make an approximation as to the amount of the deductible expenses which were paid from those loans.  We cannot, as petitioners would have us do, conclude that the entire amounts of the construction loans were paid into the Atherton project.  We could choose a raw percentage, perhaps as high as 80 or 90 percent, and apply that percentage to the total amount of the loans.  However, our choice of a percentage would be mere guesswork with no reasonable evidentiary basis.

5.  <u>Interest Expense</u>

The parties stipulated that "During respondent's audit of the 1992-generated net operating loss carryover deduction claimed

---

[18]Petitioners' situation in this case is a result of their own inexactitude and failure to maintain records of their expenses.  Further, we find petitioners' efforts before trial to locate any records that might be in the hands of third parties especially lax.  Moreover, Mr. Assaad's testimony at trial was confusing, and he repeatedly could not remember seemingly important facts.  His testimony did not help to substantiate his expenses, and he did not provide any rational basis from which to estimate those expenses.

on petitioners' 1996 and 1997 Forms 1040, petitioners substantiated only $519,135 in mortgage interest paid in connection with the development of the Atherton properties." Petitioners claim, however, that they incurred interest expenses in excess of that amount. Petitioners account for the interest reserves which were set up as part of the construction and other loans. However, they suggest that those interest reserves covered only a portion of their interest expenses. Petitioners contend that they paid interest at rates equal to the Federal guidance rates or "G" rates.[19] They use those rates to estimate the interest that they purportedly paid on the loans.[20]

Even if we were to assume that the "Pacific Bank Guidance Rate" is the same as the "G" rate, we cannot take the next step and assume that petitioners paid interest at those rates. There is no direct evidence that petitioners paid any interest in excess of those amounts which Pacific collected from interest reserves in the loans.

---

[19]On Feb. 25, 2002, petitioners filed a request for judicial notice of the Federal guidance rates ("G" rates) applicable to the period Dec. 1, 1988, through Jan. 23, 1992, as published by the Federal Reserve Board. We take judicial notice of the "G" rates as published.

[20]The Pacific loan documents cite a variable interest rate determined under "The Pacific Bank Guidance Rate". Petitioners assume that this guidance rate provides for the same interest rates for the relevant period as the "G" rates. On the record before us, petitioners have not established that this guidance rate is the same as the "G" rates for the applicable period.

We also point out that petitioners' method of estimating their expenses fails to establish the precise amount of the interest reserves set up in the various loans upon which they rely.  Given this failure and the possibility apparent from the testimony at trial that additional interest reserves, apart from those established in the record, might have been set up, adopting petitioners' method might result in a double-counting of deductible expenses.[21]  This provides us all the more reason for rejecting petitioners' method of estimating their construction and interest expenses.

Relatedly, petitioners also claim additional interest expense on the land loan from Pacific for the period December 1, 1988, to July 28, 1989, estimated on the basis of the "G" rates for that period.  First, as above, we are not inclined to accept

---

[21]As we discussed above, petitioners attempt to estimate their construction expenses by referencing the amounts of the construction and other loans.  They argue that the entire amount of those loans represents construction expenses that are deductible or increase their basis in the project.  With respect to their claims of additional interest expenses, they rely on the Federal "G" rates to estimate the interest that accrued on, and was paid with respect to, the construction and other loans. However, there is evidence and testimony that interest reserves, other than those reserves which petitioners account for on brief, might have been set up in the various loans.  Allowing the construction loans as an estimate of the construction expenses, as petitioners argue, and allowing these additional interest expenses would result in a double deduction, if in fact additional interest reserves were set up and these supposed additional interest expenses were paid from those reserves. Petitioners have failed to preclude this possibility in the reconstruction of their construction and interest expenses.

the "G" rates as an estimate of the interest paid on the loan. Second, although there is no direct evidence of an interest reserve's having been established with respect to the land loan, Mr. Waters testified that $1.4 million was paid into the land and that $60,000 could have been used for fees or may have been used as an interest reserve. Petitioners again have not precluded the possibility of a double-counting of their claimed additional interest expense.

Petitioners also claim that they paid $113,812 in interest to California Federal in 1991 with respect to the refinancing of the First National Bank loan. Petitioners rely on a statement from California Federal which states that the total interest paid in 1991 was $113,812.35. Although this interest appears to have been paid on the California Federal refinancing of the original First National loans to Mr. Assaad, it is also clear that the interest was paid on the entire amount of the California Federal loan of $1.1 million. However, petitioners received cash back in that loan transaction in the amount of $120,802.70, which amount they did not establish was paid into the Atherton project. Petitioners do not rely upon that amount on brief in computing their NOL for 1992. Any interest deduction would have to be reduced to account for this amount, because this amount could have conceivably been used for personal expenses. Further, per our discussion above, petitioners did not establish that the

entire amount of the loans from First National was paid into the Atherton project. Thus, petitioners did not provide any reasonable evidentiary basis for estimating the deductible expenses that were paid with proceeds of those loans. For similar reasons, petitioners did not establish what amounts of the interest payments were made on account of expenditures for the Atherton project.[22]

6. Other Expenses ("Soft Costs")

Petitioners claim that they incurred certain "soft costs"[23] in constructing the Atherton houses and that those soft costs were not a part of the loans from Pacific, First National, or California Federal. They contend that those loans covered only

---

[22]Relatedly, in petitioners' reply brief, they point to a $120,012 excess passive investment carried over from 1991. On a Schedule E, Supplemental Income and Loss (From rents, partnerships, estates, trusts, REMICs, etc.), attached to their 1991 return, petitioners reported expenses from a rental property located at Atherton. Those expenses consist of $469 insurance, $113,812 mortgage interest paid to banks, $1,200 taxes, $4,231 utilities, and $300 gardening. Petitioners claim that $6,200 ($120,012 minus $113,812 interest expense) of this amount is allowable in computing their NOL for 1992. We disagree. Petitioners provided no substantiation for those purported expenses other than their return. Further, it is conceivable that those expenses were paid from the construction loan proceeds and not from petitioners' own resources.

[23]Mr. Butler testified that banks normally refer to "hard costs" and "soft costs". Soft costs include legal fees, owner's insurance, utilities, and other costs not related to the construction of the job. Hard costs include architect fees, permit fees, management fees, and job insurance. Costs relating to business vehicles would normally be soft costs, unless they were related to the construction job.

"hard costs" and that Mr. Assaad paid the soft costs from his own funds. Petitioners claim that respondent allowed those expenses, which were claimed in their 1992 return, in his examination of the 1996 and 1997 returns.

The only item in the record regarding these expenses is the Schedule C attached to the 1992 return that petitioners filed. The fact that a return is signed under penalty of perjury is not sufficient to substantiate deductions claimed on it. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Petitioners provided no direct or indirect evidence to substantiate their so-called "soft costs" of construction. We have no rational basis for estimating those expenses, verifying whether they were in fact incurred, or determining their deductibility. Further, petitioners have not adduced sufficient proof to show that those costs were not paid with the proceeds of the construction loans. Petitioners claim, but point to no evidence of record to establish, that respondent allowed the expenses as part of his examination of the 1996 and 1997 returns.

7. Conclusion

Because petitioners have failed to substantiate properly, or otherwise present a reasonable evidentiary basis for estimating, the expenses that were paid into the Atherton project in amounts greater than the amounts that respondent allowed in the notice of deficiency, we sustain respondent's computation of the NOL for

1992.  Petitioners are not entitled to NOL carryforward deductions in 1996 and 1997, except to the extent determined in the notice of deficiency.

B.  Addition to Tax and Penalties[24]

Respondent determined an addition to tax under section 6651(a)(1) for petitioners' failure to file timely their 1997 return.  Section 6651(a)(1) imposes an addition to tax in the case of a failure to file a return on or before the specified filing date.[25]  The taxpayer bears the burden of proving that the failure to file the required return did not result from willful

---

[24]Under sec. 7491(c), the Commissioner has the burden of production in any court proceeding with respect to the liability of any individual for any addition to tax or penalty.  However, this provision applies only to those court proceedings which arise in connection with examinations commencing after July 22, 1998.  RRA 1998 sec. 3001(c), 112 Stat. 727.  The examination for petitioners' 1996 taxable year commenced before July 22, 1998.  Thus, sec. 7491(c) is not applicable to that taxable year.  With respect to petitioners' 1997 taxable year, there is no evidence of record establishing when the examination commenced for that taxable year, and petitioners make no argument on this issue with respect to their 1997 taxable year.  We hold that sec. 7491(c) does not apply.  Even if the examination of petitioners' 1996 and 1997 taxable years commenced after the effective date of sec. 7491(c), respondent has presented sufficient evidence to show that imposition of the addition to tax and penalties is appropriate.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

[25]The addition to tax is equal to 5 percent of the amount of the tax required to be shown on the return if the failure to file is not for more than 1 month.  An additional 5 percent is imposed for each month or fraction thereof in which the failure to file continues, to a maximum of 25 percent of the tax.  The addition to tax is imposed on the net amount due.  Sec. 6651(a)(1) and (b); Pratt v. Commissioner, T.C. Memo. 2002-279.

neglect and that the failure was due to reasonable cause. Higbee v. Commissioner, 116 T.C. at 447.

Petitioners did not file their 1997 Federal income tax return until January 6, 2000, approximately 1 year and 9 months after the due date for that return. Petitioners did not introduce any evidence showing a reasonable cause for their failure to file timely their return. At trial, respondent's counsel asked Mr. Assaad the reason for the untimely filing of the 1997 return. Mr. Assaad could not offer any explanation as to why the 1997 return was filed untimely, but testified: "I don't know the reason, to be honest. The accountant always deal with my wife, because we changing Mr. Lopez to someone else. So I am not sure." Mrs. Assaad did not testify at trial, and, since she is a party to this proceeding, any failure on her part, and consequently any reliance by Mr. Assaad on his wife, does not provide reasonable cause with respect to the section 6651(a)(1) addition to tax. Further, reliance on an accountant or tax return preparer to file timely a Federal income tax return generally does not establish reasonable cause or preclude willful neglect. See Schirle v. Commissioner, T.C. Memo. 1997-552. Taxpayers have a personal and nondelegable duty to file a timely return, and reliance on an accountant to file a return does not provide reasonable cause for an untimely filing. United States v. Boyle, 469 U.S. 241, 249 (1985) (and cases cited thereat).

Petitioners did not introduce evidence to show that the untimely filing was attributable to any reasonable reliance on their accountant(s). We sustain the section 6651(a)(1) addition to tax which respondent determined.[26]

Respondent determined accuracy-related penalties under section 6662(a) for petitioners' 1996 and 1997 taxable years. Under section 6662(a), an accuracy-related penalty of 20 percent is imposed on any portion of an underpayment of tax that is attributable to negligence or to any substantial understatement of income tax. For the 1996 taxable year, respondent determined that petitioners are liable for an accuracy-related penalty attributable to negligence or disregard of rules or regulations. For the 1997 taxable year, respondent determined that petitioners are liable for an accuracy-related penalty attributable to a substantial understatement of tax or, in the alternative, due to negligence or disregard of the rules or regulations.

Negligence is defined as a lack of due care or failure to do what a reasonable and prudent person would do under like circumstances. Sec. 6662(c). In the instant case, petitioners'

---

[26]Petitioners' only argument on brief is that "Petitioners would clearly have owed no tax but for the loss of their records. It is debatable whether having no tax liability was justification for the petitioners in filing their 1997 return". Even if a reasonable belief that no taxes were owing and consequently a belief that no tax return need be filed might establish reasonable cause, petitioners did not introduce testimony or evidence as to this issue.

made an erroneous computation of their 1992 NOL and their resulting carryforward deductions. They failed to report $2,052,385.23 of foreclosure income that they realized from the sale of 15 Isabella in 1992. They failed to substantiate properly their expenses in the Atherton project, and they failed to maintain adequate records for purposes of determining their correct tax liability for 1992, 1996, and 1997. See Higbee v. Commissioner, supra at 449; Joseph v. Commissioner, T.C. Memo. 2003-19 (failure to substantiate items properly is evidence of negligence); Bishop v. Commissioner, T.C. Memo. 2001-82; sec. 1.6662-3(b)(1), Income Tax Regs. They overstated their depreciation deductions by at least $148,747 for 1993, $324,033 for 1994, $324,033 for 1995, and $324,033 for 1996. These overstatements reduce the amount of the NOL available for a carryforward to the 1996 and 1997 taxable years and also result in an additional adjustment of $324,033 for the 1996 taxable year. We find that the understatements for 1996 and 1997 are attributable to petitioners' negligence in failing to ascertain their correct income tax liability, in failing to maintain required records, and in failing to substantiate their construction expenses.

The accuracy-related penalty is not imposed if the taxpayer shows there was a reasonable cause for the underpayment and that he acted in good faith with respect to the underpayment. Sec.

6664(c)(1). This determination is made considering all relevant facts and circumstances. Relevant factors include the taxpayer's efforts to assess his proper tax liability, including his reasonable and good faith reliance on the advice of a professional. An honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith. Higbee v. Commissioner, supra at 448-449. The taxpayer bears the burden of proof regarding this exception. Id. at 447.

On brief, petitioners do not point to any specific circumstances which might trigger the reasonable cause exception. However, they do suggest that their failure to maintain adequate records and to substantiate properly their expenses is attributable to the alleged fact that "petitioners' records disappeared while in the possession of his now-deceased accountant and that his subsequent accountant made an inadequate effort to replace them." Good faith reliance on a tax return preparer or accountant to maintain required records, and a failure by that representative to do so, may establish the taxpayer's entitlement to relief under section 6664(c)(1). See Xuncax v. Commissioner, T.C. Memo. 2001-226. However, such a loss or destruction of required records alone does not establish that the taxpayer's deductions and claimed expenses were founded on reasonable cause and good faith when made. See id.

Petitioners did not establish that the underpayments on their 1996 and 1997 returns were attributable to the death of Mr. Hunt, to any loss or destruction of the records of their expenses, or to any failure to replace records by Mr. Lopez. Although Mr. Lopez testified that the failure in substantiating the expenses in the audit of the 1992 return was due in part to Mr. Hunt's death, he also testified that this failure was also due to Mr. Assaad's lack of cooperation. Mr. Lopez testified that, as far as he knew, petitioners got the records back. Also, the testimony of Mr. Waters and Mr. Assaad suggests that records of the various expenses in the Atherton project do exist and that Mr. Assaad made no genuine attempt to obtain those records and to present those records into evidence. Mr. Waters testified that Pacific kept records of the expenses in the Atherton project and that Mr. Assaad had, or obtained, those records when he sued the bank and Mr. Waters personally in a lawsuit related to the Atherton project. Further, Mr. Assaad testified that Mr. Trudell was in possession of the construction expense records, including computer records, for the Atherton project. He further testified that he did not contact Mr. Trudell until 1 week before trial "Because there wasn't any need for me to contact him. I just forgot about the whole thing."

Petitioners' underpayment of taxes for 1996 and 1997 was also attributable to their substantial overstatement of their

depreciable basis in St. Rose Manor.  Neither Mr. Hunt nor Mr.
Lopez prepared petitioners' returns after 1992, and petitioners
offered no explanation for this overstatement.  Petitioners did
not establish that the underpayment of taxes was due to errors by
their representatives and not due to errors on their part.
Petitioners did not demonstrate that they supplied accurate
information to their representatives for purposes of preparing
the relevant returns.  See Xuncax v. Commissioner, supra.
Petitioners have not shown that they are entitled to relief under
section 6664(c)(1).  We sustain the accuracy-related penalties as
determined.

Decision will be

entered for respondent.