EDWARD VANICEK, DECEASED, AND SARA VANICEK, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN B. MODEN AND RUTH MODEN, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16187–79, 16201–79.     Filed November 6, 1985.

*J. Patrick Doherty* and *Robert A. Bedore*, for the petitioners.
*William C. Sabin, Jr.*, for the respondent.

NIMS, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 16187–79 | Edward Vanicek, deceased, | 1972 | $1,636.04 |
| | and Sara Vanicek | 1973 | 2,781.76 |
| | | 1974 | 3,626.76 |
| 16201–79 | John B. Moden | 1972 | 829.20 |
| | and Ruth Moden | 1973 | 895.25 |
| | | 1974 | 957.00 |

The issues for decision are (1) whether the fair rental value of lodging furnished to petitioners by their employer, the Forest Preserve District of Cook County, Illinois, is excludable from gross income under section 119[1]; and (2) whether the Vaniceks

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect for the years in question. All Rule references are to the Tax Court Rules of Practice and Procedure.

are entitled to deduct under section 162 certain expenses incurred operating and maintaining their residences.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Edward Vanicek and Sara Vanicek, husband and wife, resided in Ironton, Missouri, when they filed the petition in this case. Petitioners John B. Moden and Ruth Moden, husband and wife, resided in San Diego, California, when they filed the petition in this case. The parties have stipulated pursuant to section 7482(b)(2) that the decision of the Court in these cases may be reviewed by the U.S. Court of Appeals for the Seventh Circuit.

### *The Forest Preserve District*

During the years in issue, petitioners Edward Vanicek and John Moden were employed by the Forest Preserve District of Cook County, Illinois (hereinafter sometimes referred to as the district). The district, an incorporated political unit of the State of Illinois, was created by State statute in 1915 "To acquire * * * and hold lands * * * containing one or more natural forests or lands connecting such forests or parts thereof, for the purpose of protecting and preserving the flora, fauna and scenic beauties within such district, and to restore, restock, protect and preserve the natural forests and said lands together with their flora and fauna, as nearly as may be, in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public."

Since 1915, the district has systematically acquired property to return the land to its natural state as well as to develop golf courses, swimming pools, nature centers, and picnic areas on and throughout the district property. This systematic reconstruction and preservation is intended to benefit the people of the entire Chicago metropolitan area. As of February 19, 1975, the district owned 64,730 acres of land throughout Cook County, Illinois.

The general headquarters for the district is located in the approximate center of its land holdings. Twelve division

headquarters are located throughout the district property. The division headquarters are operated by law enforcement officers, called "rangers," who are responsible for the safe operation of the district lands. The rangers are on duty at the division headquarters from 9 a.m. until 1 a.m. In the event an emergency occurs while the rangers are not on duty, individuals on duty at the general headquarters attempt to call rangers at home, the local police, or resident watchmen.

Resident watchmen are selected from employees of the district by the district's general superintendent to protect designated areas within the district from fire, hunting, vandalism, or other encroachment. The district initiated the resident watchman program in 1918 to support the rangers in the performance of their duties. Although the services performed by the resident watchmen were often duplicative of the services performed by the rangers, this duplication was necessary, given the inadequate number of rangers available to patrol all of the district's land.

As a condition of being a resident watchman, people performing this function were required to live in residences strategically located within the areas they were assigned to patrol. These houses were not constructed by the district. Rather, they were incidentally acquired as pre-existing structures located on property obtained by the district. Although participants in the resident watchman program were not paid additional compensation for their services as resident watchmen, they were allowed to live in the residences rent free.

A prospective resident watchman must file an application for permit in which he agrees to (1) maintain a telephone in his residence at his own expense; (2) answer emergency and fire calls at all times; (3) remain on areas, in fire season, at all times; and (4) maintain his residence at his own expense. Once accepted as a resident watchman, he receives a document listing his specific duties as follows:

1. You must be thoroughly familiar with District boundaries within your assigned area and make periodic inspections to make certain that District property is protected.

2. Check for encroachments especially by home owners living adjacent to District lands.

3. Be on constant watch for fires. During times of extreme fire dangers, all residents must remain on his respective area at all times. You are required to have in your possession either a fire flapper or back pack pump. You will

be required to report to Division headquarters for weekend fire watch duty in times of extreme fire danger.

4. Check your area frequently during the hunting season. Report all hunters to your Division Superintendent immediately. Do not try to apprehend them.

5. You are expected to clean all minor debris dumping incidents. Report all major dumpings at once.

6. Check all water bodies for picnic tables and other objects and report same to the Division Superintendent.

7. Check all facilities for vandalism. Do not apprehend vandals, but try to obtain positive identification for authorities. (i.e. make, model, and license number of car if available).

8. Complete and submit resident watchman reports on a monthly basis.

During the years in issue, the resident watchmen did not possess police powers nor did they wear uniforms or badges identifying them as park employees.

### Edward Vanicek

Edward Vanicek (Edward) was employed as a heavy equipment operator by the district in 1932. Edward was appointed a resident watchman in 1937.

During the years in issue, Edward was employed as a Maintenance Supervisor II by the district. As a maintenance supervisor, Edward was in charge of the central equipment garage located in downtown Chicago, several miles from the district's general headquarters. Edward generally worked at the garage on weekdays from 8 a.m. until 4 p.m.

In addition to his employment as a maintenance supervisor, Edward also served as a resident watchman during the years in issue. As a resident watchman, Edward, with his wife, Sara, resided in District Property No. 115 and District Property No. 525 rent free from 1972 through May 15, 1973, and from May 15, 1973 through 1974, respectively. For purposes of this opinion, the parties agree that during the years in issue, the monthly fair rental value of District Property No. 115 and District Property No. 525 was $275 and $475, respectively.

As a resident watchman of District Property No. 115 and District Property No. 525, Edward was responsible for an area consisting of approximately 365 acres and 824 acres, respectively. The designated area surrounding Property No. 115 included reforestation beds, an overflow parking lot, a boat launch, and a shelter. The minimum value of this property

during the years in issue was $313,200. The designated area surrounding Property No. 525 included several picnic groves and a nature preserve. The minimum value of this property during the years in issue was $950,625. A substantial portion of the designated areas surrounding Edward's residences at Property No. 115 and Property No. 525 was visible from those residences.

During the years in issue, Edward patrolled his designated area 2 to 3 times per week on foot and in his automobile. While living at Property No. 115, Edward and his wife also observed their designated area several times a day from inside their house through field glasses.

Edward maintained a fire flapper[2] and a backpack pump in his home and carried these devices while patrolling to extinguish small fires which he might discover. In the event Edward discovered large fires or other emergencies which required assistance, he would call the appropriate division headquarters.

During the years in issue, Edward paid the following expenses incident to the use, repair, and maintenance of Properties Nos. 115 and 525:

| Property No. 115 | 1972 | 1973 (5 Months) |
|---|---|---|
| Electric | $376.04 | $175.48 |
| Gas | 315.92 | 139.53 |
| Telephone | 135.84 | 60.51 |
| Water (well) | 0 | 0 |
| Improvements, repairs, or alterations | Unknown | Unknown |

| Property No. 525 | 1973 (7 Months) | 1974 |
|---|---|---|
| Electric | $314.65 | $636.50 |
| Gas | 201.41 | 365.98 |
| Telephone | 84.71 | 155.40 |
| Water | 43.94 | 101.17 |
| Improvements, repairs, or alterations | Unknown | Unknown |

### John B. Moden

John Moden (John) was employed in 1959 as a laborer for the Billy Caldwell Golf Course, one of eight public golf courses

---

[2] A fire flapper consists of a rubber pad attached to a long handle. The user pulls the fire flapper across a fire to smother it.

owned and operated by the district. John was promoted to golf course manager in 1960 and held that position until his retirement in June 1977. Simultaneous with his promotion to golf course manager, petitioner accepted appointment as resident watchman at District Property No. 207 located at the fifth tee on the Billy Caldwell Golf Course. John's duties as golf course manager and resident watchman often overlapped.

The job description for a golf course manager prepared by the district provided as follows:

JOB SUMMARY:

Operates and maintains one of seven district golf courses. Trains and instructs cashiers, checkers, and greenskeeping personnel. Responsible for all money collected on the course. Directly supervises Laborers involved in the maintenance and operation of the golf course.

TYPICAL DUTIES:

Checks all golf course mobile equipment to insure that its operating condition is satisfactory. Assigns men to their respective duties. Insures that greens and fairways have been mowed and ball washers cleaned and filled. Checks daily time sheet reports.

Checks course regularly throughout the day. Insures the smooth operation of the golf course between twelve and fourteen hours a day, seven days a week. Trains assistants and laborers in the operation of all manual and mechanized equipment. Maintains inventory of tools, materials, equipment and supplies.

Analyzes turf and soil conditions and determines necessary measures required to grow and maintain a healthy grass. Determines watering schedules, treatment of turf diseases, fertilization schedules, turf propagation methods, chemical soil analysis, chemical weed control, and soil aeration needs. * * *

The duties listed are not set forth for purpose of limiting the assignment of work. They are not to be construed as a complete list of the many duties normally to be performed under a job title or those to be performed temporarily outside an employee's normal line of work.

In addition to the above-listed duties, John would (1) patrol the golf course 2 to 3 times each evening; (2) investigate disturbances on the golf course at night; (3) answer calls to the golf course on a telephone in his residence listed in the name of the golf course; and (4) monitor and safeguard various tools, materials, equipment, and supplies that were stored in a service building adjacent to John's residence. More than 85 percent of the golf course was visible from John's residence.

During the years in issue, the monthly fair rental value of Property No. 207 was $150 per month. The minimum value of the land, equipment, and buildings situated on the Billy Caldwell Golf Course was $707,680.

On their Federal income tax returns for the years in issue, petitioners did not report as income the fair rental value of lodging furnished to them rent free as participants in the district's resident watchman program. In the statutory notice of deficiency, respondent determined that petitioners should have reported this amount as income.

OPINION .

The first issue for decision is whether petitioners are entitled to exclude from gross income the fair rental value of lodging furnished to them by their employer.

Gross income is defined in section 61 to include all income from whatever source derived, including compensation for services. It includes income realized in any form, i.e., money, property, or services. Sec. 1.61–2(d)(1), Income Tax Regs. If compensation for services is paid in the form of property, the fair market value of the property must be included in income. Sec. 1.61–2(d), Income Tax Regs. In the instant case, although Edward was not required to live in his lodgings to perform his duties as maintenance supervisor, the parties agree that the lodgings were furnished to him because of his employment as a resident watchman. The parties also agree that John received the rent-free use of his lodgings because of his employment as both resident watchman and golf course manager. Consequently, the value of such lodgings is includable in petitioners' gross income for the years in issue, unless specifically excludable under another provision of the Code. *Commissioner v. Duberstein*, 363 U.S. 278 (1960); *Commissioner v. LoBue*, 351 U.S. 243 (1956). Petitioners contend that the value of their lodgings is excludable under section 119.

Section 119 grants an exclusion for lodging furnished to an employee by his employer if three conditions are met: (1) The lodging is furnished for the convenience of the employer; (2) the lodging is on the business premises of the employer; and (3) the employee is required to accept the lodging as a condition of

his employment.[3] The failure of petitioners to meet any one of these requirements will cause the value of their lodgings to be included in gross income. *Dole v. Commissioner*, 43 T.C. 697, 705 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965). Respondent contends that petitioners failed to meet all three of the statutorily imposed conditions. His determination is presumptively correct and petitioners have the burden of proving error in this determination. Rule 142(a). On the facts before us, we believe that petitioners have satisfied their burden of proof.

We must first determine whether petitioners were required to accept their lodging as a condition of their employment. According to the relevant regulations, the "condition of employment" test is satisfied if an employee is—

required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times *or* because the employee could not perform the services required of him unless he is furnished such lodging. * * * [Sec. 1.119–1(b), Income Tax Regs. Emphasis supplied.]

We observe that the conditions stated in the last sentence of the above-quoted regulation are stated in the disjunctive. Admittedly, neither John, nor especially Edward, was required to be available for duty at all times. Nevertheless, the requirements of the regulation can be met if performance of the watchmen services required that the lodging be furnished to the employee. Respondent contends that petitioners' duties as resident watchmen did not require their occupancy of the lodging. We disagree.

Petitioners, as resident watchmen, were required to be on call to respond to fires and other emergencies which might

---

[3]For the years in question, sec. 119 provided:

SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF EMPLOYER.

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

(1) in the case of meals, the meals are furnished on the business premises of the employer, or

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

Effective Nov. 9, 1978, sec. 205 of Pub. L. 95–615, 92 Stat. 3107, amended sec. 119 in certain ways not germane to the issues presented in this case.

develop in their designated areas at night. The strategic location of petitioners' residences within their designated areas enabled the district to rely on petitioners' prompt response to any emergency that might arise. We therefore find that petitioners were required to accept their lodging as a condition of their employment. See *Benninghoff v. Commissioner*, 71 T.C. 216 (1978), affd. per curiam 614 F.2d 398 (5th Cir. 1980).

We also find that petitioners' lodgings were furnished for the convenience of the district. The "convenience of employer" test is essentially the same as the "condition of employment" test. *United States Junior Chamber of Commerce v. United States*, 334 F.2d 660, 663 (Ct. Cl. 1964). Thus, for the reasons stated above, we also find that petitioners have satisfied the "convenience of employer" test.

To exclude the value of their lodgings from income under section 119, petitioners must also satisfy their burden of proving that their lodgings were located on the business premises of the district.

The regulations provide that "the term 'business premises of the employer' generally means the place of employment of the employee." Sec. 1.119–1(c)(1), Income Tax Regs. Since Edward and John performed all of their watchmen services on the district's property where the houses were located, the short answer would seem to be that the lodgings were located on the business premises of the employer. The reported cases support the conclusion that the short answer is the right answer.

Lodging is considered located "on the business premises of the employer" if such lodging is furnished at a place where the employee performs a significant portion of his duties or on the premises where the employer conducts a significant portion of his business. *McDonald v. Commissioner*, 66 T.C. 223, 230 (1976). We have also held that lodging is located on the business premises of the employer if (1) the living quarters constitute an integral part of the business property or (2) the company carries on some of its business activities there. *Dole v. Commissioner*, 43 T.C. 697, 707 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965). The extent or boundaries of the business premises in each case is a factual question whose resolution follows a consideration of the employee's duties as well as the nature of the employer's business. *Lindeman v.*

*Commissioner,* 60 T.C. 609 (1973). "The touchstone of the business premises test is the lodging's relationship to the business activities of the employer." That is, "The property must bear an integral relationship to the business activities of the employer." *Benninghoff v. Commissioner, supra* at 221.

Respondent does not dispute that petitioners' residences were located on land owned by their employer, the district. Respondent argues, however, that petitioners' lodgings were not integrally related to the business activity of the district. We disagree.

The parties stipulated, without citation to the relevant authority, that the legislation which created the Forest Preserve District described the nature of the district's business as follows:

To acquire * * * and hold lands * * * containing one or more natural forests * * * for the purpose of protecting and preserving the flora, fauna and scenic beauties within such district, and to restore, restock, protect and preserve the natural forests and said lands together with their flora and fauna, as nearly as may be, in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public.

Thus, during the years in issue, a major business activity of the district was to protect and preserve approximately 64,000 acres of land for the public's education, pleasure, and recreation.

Petitioners' appointments as resident watchmen and their occupancy of strategically located residences were an integral part of the district's efforts to protect and preserve the district's more than 64,000 acres of land. As resident watchman of the Billy Caldwell Golf Course, John was required to safeguard the golf course as well as various tools, materials, equipment, and supplies that were stored in a service building adjacent to John's residence. Because John could observe more than 85 percent of the golf course from his residence on the fifth tee, his strategically located residence enabled him to continuously monitor a substantial portion of the golf course and service building, 24 hours a day. Indeed, John testified at trial that as a result of his location on the golf course, he was alerted to, and consequently able to respond to, parties taking place on the greens and vandals intending to damage the greens.

Similarly, the strategic location of Edward's seriatim residences within his designated areas enabled him to perform his resident watchman duties at Properties Nos. 115 and 525 during each of the periods during which he resided on these respective properties. From these residences, Edward was able to observe a substantial portion of his designated areas and therefore was able to continuously monitor those areas for fire, hunting, and vandalism. The strategic location of Edward's residences also allowed him to quickly respond to any problem he might discover. The district's ability to rely on Edward's quick response to problems was especially important during the hours of 1 a.m. to 9 a.m. when the rangers were off duty. During this period of time, the resident watchmen were often the first people called by the district's general headquarters to respond to emergencies arising in their designated areas.

A major business activity of the district was the protection and preservation of more than 64,000 acres of land. The district's primary reason for providing these residences to petitioners was to enable them to protect their designated areas from fire, vandalism, hunting, and other encroachments. Indeed, we are convinced that petitioners' location at these residences was integral and essential to the performance of their duties as resident watchmen. Consequently, we must conclude that petitioners' residences were integrally related to a major business activity of the district.

Respondent, relying on *Benninghoff v. Commissioner, supra,* argues that in the absence of petitioners' performance of significant employer activities at their residences, we cannot find that petitioners' residences were located on the district's business premises. In *Benninghoff,* the Canal Zone Government required the taxpayer, a member of the Canal Zone police, to accept lodging in the Canal Zone District in which he was employed. Although the taxpayer was required always to be available for duty and to maintain a specially equipped telephone in his residence, we held that the mere fact that the taxpayer was required to live somewhere in the Canal Zone (as were all Government employees) did not justify a holding that the taxpayer's residence was located on the business premises of his employer. In so holding, we found that "the Canal Zone Government furnished the apartment as a purely personal residence and not as an integral part of its business operations.

Nor did it require substantial employment activities by [taxpayer] in the residence." 71 T.C. at 223.

Without doubt, the performance of significant employer activities at the taxpayer's residence is often an important factor to consider in determining whether lodgings are located on the business premises of an employer; nevertheless, we do not believe that the absence of this factor is determinative in every case. To argue, as respondent seems to be arguing, that the conditions of section 1.119–1(b), Income Tax Regs., can only be met by the performance of services within the four walls of a structure strikes us as illogical. Both Edward and John were required to be watchmen, both from within their respective strategically located residences and by "walking the territory." Thus, while we agree with respondent that "business premises" is not an infinitely elastic concept, we do not believe that its parameters are to be as severely circumscribed as respondent contends. Accordingly, we find that petitioners are entitled to exclude from gross income under section 119 the fair rental value of their residences. We therefore need not consider petitioners' alternative arguments for exclusion.

The next issue for decision is whether the Vaniceks are entitled to deduct under section 162 certain utility expenses incurred in operating their residences. Edward contends that these expenses were incurred in carrying on his business as a resident watchman. Specifically, Edward contends that because his lodgings would not be usable for performing the functions of a resident watchman unless they were provided with basic utilities, such expenses are deductible as ordinary and necessary business expenses under section 162(a).

Section 162(a) allows a taxpayer to deduct all ordinary and necessary business expenses paid or incurred during the taxable year. However, a taxpayer's personal or living expenses are not deductible. Sec. 262. Although we agree with Edward that the portion of his utility expenses allocable to his business use of the residences would be deductible under section 162(a), the record contains no evidence from which we could reasonably apportion the utility expenses between Edward's business and personal use of the residences. While it is within the purview of this Court to estimate the amount of allowable deductions where there is evidence that deductible expenses were incurred (*Cohan v. Commissioner*, 39 F.2d 540

(2d Cir. 1930)), we must have some basis on which an estimate may be made. *Williams v. United States*, 245 F.2d 559 (5th Cir. 1957). Because the record contains no evidence upon which we could base such an estimate, we find that the Vaniceks have failed to prove that they are entitled to claim any deductions under section 162(a). Rule 142(a).

To reflect the foregoing,

> *Decision will be entered under Rule 155 in docket No. 16187–79.*
>
> *Decision will be entered for the petitioners in docket No. 16201–79.*

---

[1] Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended.