**PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b),THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.**

T.C. Summary Opinion 2014-70


UNITED STATES TAX COURT


SAID H. KORIAKOS AND NARGIS G. KORIAKOS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14843-12S.                      Filed July 16, 2014.


Said H. Koriakos and Nargis G. Koriakos, pro sese.

<u>Randall B. Childs</u> and <u>Anne M. Craig</u>, for respondent.


SUMMARY OPINION


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioners' Federal income tax of $13,271 and $23,083 for 2006 and 2008, respectively.  In addition, respondent determined an accuracy-related penalty under section 6662(a) of $2,654 for 2006.[2]  After a concession by petitioners,[3] the issues for decision are:

(1) Whether petitioners are entitled to deductions for charitable contributions and unreimbursed employee business expenses as claimed by them on their Schedule A, Itemized Deductions, for 2006.  We hold that they are but only to the limited extent provided herein;

(2) whether petitioners are entitled to deductions for various expenses as claimed by them on their Schedule C, Profit or Loss From Business, for 2006.  We hold that they are but only to the limited extent provided herein;

---

[1] Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code (Code) in effect for 2006 and 2008, the taxable years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] All monetary amounts are rounded to the nearest dollar.

[3] Petitioners concede that they are not entitled to deduct $15,000 paid to petitioner Said H. Koriakos' brother in Egypt for him to obtain medical care there.

(3) whether petitioners failed to report on their 2008 return income from cancellation of indebtedness.  We hold that they did; and

(4) whether petitioners are liable for the accuracy-related penalty under section 6662(a) for 2006.  We hold that they are if there is a substantial understatement of income tax for such year.

Other adjustments made by respondent in the notice of deficiency are purely mechanical.

## Background

Some of the facts have been stipulated, and they are so found.  We incorporate by reference the parties' stipulation of facts and accompanying exhibits.

Petitioner Said H. Koriakos (petitioner) and petitioner Nargis G. Koriakos (Mrs. Koriakos), collectively "petitioners", resided in the State of Florida at the time that the petition was filed with the Court.

### Petitioners' Professional and Business Backgrounds

Petitioner's first job in the United States was as a financial examiner for the Colorado State Insurance Department (department).  While in that position, petitioner became licensed as a certified public accountant (C.P.A.) by the State of Colorado in 1983.  Petitioner allowed his C.P.A. license to become inactive when

he resigned from the department in 1984. However, petitioner has continued to hold himself out as a C.P.A. on his business cards without regard to the status of his license.

From 1984 to 1987 petitioner worked for Warren Buffett at Berkshire Hathaway, where petitioner "built all my expertise".

In 1987 petitioner ventured out on his own as a business turnaround specialist, focusing primarily on insurance companies. As a turnaround specialist, petitioner offers his services, either as an employee or as an independent contractor, to "take care of whatever problems * * * [a company] might have, turn it around, have it ready for sale or hire the staff to move on and do something else." From 1987 through the date of trial petitioner's principal income-producing activity has been as a turnaround specialist.

In 1990 petitioner earned a master's degree in business administration (M.B.A.).

In addition to being a C.P.A. and holding an M.B.A., petitioner is licensed as a real estate broker in Arizona and Florida. Mrs. Koriakos is licensed as a real estate salesperson in Arizona. Together petitioners own St. Mary Realty & Business Brokerage, an unincorporated business in Arizona that was sited in petitioners' home in Fountain Hills, Arizona.

Petitioner's Employment at Student Resources in Florida

In late 2004 or early 2005, at a time when petitioners were living in a suburb of Phoenix, Arizona, petitioner was contacted by Student Resources, a healthcare insurance division of The Mega Life & Health Insurance Co., that was hemorrhaging money.  Petitioner was hired to "turn around this division, make it profitable so they can sell it, and leave when it's over."  Petitioner's employment with Student Resources was expected to last 2½ years, or until June 30, 2007.

On January 17, 2005, petitioner began working on a full-time basis as controller for Student Resources at its office in St. Petersburg, Florida.  To facilitate his employment, petitioner entered into a condominium lease on February 1, 2005, for an apartment in Clearwater, Florida, a suburb some 20 miles away, at the Sand Key Club Condominium.  Petitioner resided in this apartment throughout his employment with Student Resources in St. Petersburg, and he commuted to and from work by automobile.  Periodically petitioner would fly to Arizona to visit Mrs. Koriakos and his family; when he was unable to do so, Mrs. Koriakos would fly to Florida and generally stay the week.

Petitioner not only succeeded in making Student Resources profitable; he achieved that goal ahead of the 2½-year schedule that his employment contract had contemplated.  Thus, on August 31, 2006, petitioner concluded his

employment as controller, receiving both salary paid through June 30, 2007, and a success bonus. Petitioner continued to lease the condominium apartment in Clearwater until September or October 2006, at which time he terminated the lease and returned to Arizona.

During his tenure in Florida petitioner "maintain[ed] a real estate license * * * just in case a license is needed in case of acting as a[n] intermediary for the sale of the company I am doing the turnaround for."

Petitioners' Arizona and Florida Homes

In 1999 petitioners jointly purchased a single-family home in a suburb of Phoenix, Arizona (Arizona home), and moved into the home in 2000. Over the years petitioners made expensive improvements to the property (e.g., $100,000 for a swimming pool) and refinanced their mortgage on several occasions. Petitioners last refinanced the mortgage on the Arizona home in December 2006 for $796,000.

When petitioner returned from Florida to Arizona in 2006, he returned enamored of Florida's Gulf Coast and the lifestyle and business opportunities that such area presented. With that in mind, petitioners began to search for a house in Florida. To facilitate the purchase of a new home, petitioners obtained a home equity line of credit from Wells Fargo in January 2007. The line of credit, which

was $146,850, was secured by petitioners' Arizona home and was a recourse liability.

In May 2007 petitioners purchased a single-family residence in Palm Harbor, Florida (Florida home), and promptly moved in.[4]  Petitioners purchased the Florida home for cash, and in doing so they "maxed out" the Wells Fargo line of credit.

After acquiring the Florida home and moving to Palm Harbor, petitioners abandoned the Arizona home, which was sold at auction on May 6, 2008, for $835,746 after a foreclosure action.[5]

The following documents were issued to petitioners following the foreclosure and sale of the Arizona home:  (1) A 2008 Form 1099-A, Acquisition or Abandonment of Secured Property, from Federal Home Loan Mortgage Corporation reflecting an effective date of May 6, 2008, and an outstanding principal balance of $796,000; Form 1099-A from Wells Fargo reflecting an effective date of May 6, 2008, and an outstanding principal balance of $146,850;

---

[4] Palm Harbor is located about 10 miles north of Clearwater on the Florida Gulf Coast.

[5] The foreclosure sale price represented the principal amount of the first mortgage, $796,000, plus interest, penalties, and costs.  Wells Fargo, as the second mortgagee (line of credit), received nothing from the foreclosure sale.

and Form 1099-C, Cancellation of Debt, from Wells Fargo reflecting debt cancellation on June 10, 2008, of $146,850.[6]

Petitioners' Income Tax Returns for the Years in Issue

Form 1040 for 2006

Petitioners self-prepared and timely filed a Form 1040, U.S. Individual Income Tax Return, for 2006. On line 7 of the Form 1040 they reported petitioner's wages of $184,494.[7] On line 63 they reported total tax of $8,165.

Petitioners attached to their return various schedules, including a Schedule A relating to charitable contributions and petitioner's work for Student Resources and a Schedule C for St. Mary Realty & Business Brokerage.

On their Schedule A petitioners claimed deductions for various itemized expenses, including gifts to charity of $22,000 and unreimbursed employee expenses of $35,075 (before application of the 2% threshold prescribed by section 67(a)) related to petitioner's employment with Student Resources. The gifts to charity consisted of the following:

---

[6] There is nothing in the record to suggest that Wells Fargo ever attempted to recoup or recover from petitioners any part of the $146,850 that was owed to it.

[7] Of this amount, petitioners received $179,474 from The Mega Life & Health Insurance Co. on behalf of Student Resources; they received the balance from another insurance company.

Gifts by cash or check:
   Petitioner's brother (see supra note 3)  $15,000
   Church (cash only)     5,000
   Subtotal    20,000
Gifts of property    2,000
   Total    22,000

In support of the deduction for gifts of property, petitioners attached to their return Form 8283, Noncash Charitable Contributions. The Form 8283 identified the donee as the Salvation Army and stated that (1) the fair market value (FMV) of the property was $2,000 and that (2) the method used to determine FMV was "thrift shop value". Petitioners provided no further information; thus, for example, they did not describe or otherwise identify the type or nature of the property donated.

In support of the deduction for unreimbursed employee expenses, petitioners attached Form 2106, Employee Business Expenses, to their return, listing the following:

| | |
|---|---|
| Vehicle expenses | $ 4,450 |
| Parking fees, tolls, and transportation | 3,750 |
| Travel expenses while away from home overnight | 19,625 |
| Other business expenses | 6,000 |
| Meals and entertainment expenses | 2,500 |
| Less: Nondeductible portion | (1,250) |
| Total unreimbursed employee expenses | 35,075 |

According to petitioner, "vehicle expenses" represented the cost of commuting between petitioner's Clearwater apartment and his place of employment in St. Petersburg with Student Resources; "parking fees, tolls, and transportation" represented airfare for flights between Florida and Arizona for both petitioner and Mrs. Koriakos; "travel expenses while away from home overnight" represented rent and utilities (electricity, telephone, cable television, and Internet service) for petitioner's Clearwater apartment; "other business expenses" represented housekeeping costs and services such as cleaning, laundry, and cooking for the Clearwater apartment; and "meals and entertainment expenses" represented "the cost of eating out and hosting business meals once or twice a month" while in Florida.

On their Schedule C for St. Mary Realty & Business Brokerage, petitioners reported zero gross receipts or sales, zero gross profit, and zero gross income. Nevertheless, they reported expenses of $18,654 for the following:

| | |
|---|---|
| Advertising | $550 |
| Car | 6,769 |
| Office | 5,500 |
| Repairs and maintenance | 435 |
| Supplies | 650 |
| Taxes and licenses | 2,550 |
| Travel | 750 |
| Deductible meals and entertainment | 250 |
| Other: | 1,200 |

| | |
|---|---|
| Tuition (real estate courses) | $500 |
| MLS keys | 125 |
| MLS subscription(s) | 575 |

| | |
|---|---|
| Total | 18,654 |

According to petitioners, "advertising expenses" represented the cost of business cards ($250) and flyers ($300); "car expenses" were approximated by applying the standard mileage rate to 300 miles per week, or 15,000 miles per year, and then adding $94 for personal property tax; "office expense" represented the $3,000 for telecommunications (landline and cellular telephone service and Internet service) and $2,500 for unidentified "one time expenses"; "repairs and maintenance" represented the cost of maintaining computers and office equipment; "supplies" represented the monthly average cost of $55 for toner, paper, and small supplies; "taxes and licenses" included realtor-related fees and licenses in Arizona and Florida as well as dues for the American Institute of Certified Public Accountants (AICPA); "travel" consisted of airfare for Mrs. Koriakos to fly from Arizona to Florida "to discuss real estate issues with * * * [petitioner] as the

broker"; "meals and entertainment" represented "food and cold drinks to clients during showings on the average of $20 at a time"; and "other expenses" represented tuition for real estate courses and various Multiple Listing Service (MLS) fees and subscriptions.

Shortly after preparing and filing their 2006 return, petitioners shredded most of the receipts and other documents they may have had that were related to the deductions claimed on their return. At trial petitioner testified that these documents "were shredded by mistake [in] cleaning up cumulative files from 25 years" incident to petitioners' move from Arizona to Florida in May 2007.

Form 1040 for 2008

Petitioners self-prepared and timely filed a Form 1040 for 2008. On their return petitioners did not report any income from cancellation of indebtedness.

Petitioners attached to their 2008 return a Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment). On the Form 982 petitioners reported an exclusion from gross income of $942,850 attributable to the discharge of qualified real property indebtedness. Petitioners did not provide any further details on this form. Nevertheless, the $942,850 represented the sum of the outstanding principal on (1)

the first mortgage ($796,000) on the Arizona home and (2) the home equity line of credit ($146,850) that was secured by the Arizona home.

Notice of Deficiency and Petition

After examining petitioners' 2006 and 2008 returns, respondent issued a statutory notice determining deficiencies in petitioners' Federal income tax for those years as well as an accuracy-related penalty for 2006. The deficiency for 2006 is attributable to the disallowance for lack of substantiation of (1) Schedule A itemized deductions for charitable gifts and unreimbursed employee expenses and (2) the Schedule C deductions claimed in respect of St. Mary Realty & Business Brokerage. The deficiency for 2008 is attributable to petitioners' failure to report the cancellation of indebtedness by Wells Fargo of $146,850 on the ground that "[t]his amount does not represent the cost of your residence in Arizona, which is the property that was foreclosed on". Finally, respondent determined the accuracy-related penalty for 2006 on the basis of a substantial understatement of income tax.

Petitioners filed a timely petition for redetermination with the Court, disputing the deficiencies and the penalty. Petitioners subsequently conceded $15,000 of the $22,000 of expenses reported for charitable gifts by cash, see supra note 3, but continued to dispute all other disallowances and determinations.

Discussion

## I. Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency are presumed to be correct, and the taxpayer bears the burden of proving that the determinations are incorrect. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); cf. sec. 7491(a)(1). This includes the burden of substantiation. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); see sec. 7491(a)(2).

## II. Deductions Claimed on Petitioners' Schedule A for 2006

### A. Charitable Contributions

#### 1. Cash Contributions

Section 170(a)(1) provides the general rule that there shall be allowable as a deduction any charitable contribution which is made within the taxable year and verified under regulations prescribed by the Secretary.

Petitioner contends that the $5,000 deduction "represents my weekly cash basket giving of around $100 a week" to petitioners' church. But petitioners never identify what church they attended or its location. In any event, anonymous cash contributions to a collection plate hardly satisfy the substantiation requirements of

section 170 and the applicable regulations, see, e.g., sec. 1.170A-13(a)(1), Income Tax Regs., and petitioners candidly admit that no record of such contributions was ever maintained.[8]  On the other hand, the Court is satisfied that petitioners did donate some cash when they attended religious services.  Accordingly, bearing heavily against petitioners whose inexactitude is of their own making, the Court holds that petitioners are entitled to a deduction for cash contributions of $500.  See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

### 2.  Property Other Than Money

Petitioners contend that they inadvertently shredded their receipt from the Salvation Army.  Yet on their Form 8283 petitioners did not even describe or otherwise identify the type or nature of the property donated, and at trial petitioner spoke only of "stuff" and "goods".

---

[8]  See generally sec. 6001 ("Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records * * * and comply with such rules and regulations as the Secretary may from time to time prescribe."); sec. 1.6001-1(a), Income Tax Regs. ("[a]ny person subject to tax * * * shall keep such permanent books of account or records * * * as are sufficient to establish the amount of * * * deductions".); sec. 1.6001-1(e), Income Tax Regs. ("The books or records required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law.").

Petitioners do not contend that any contributions were over $100; therefore, the provisions of sec. 1.170A-13(f), Income Tax Regs., do not appear to apply.

Petitioners may very well have donated clothing and household items to the Salvation Army. But if so, the record contains not a shred of evidence regarding the fair market value of such property, see sec. 1.170A-1(c), Income Tax Regs., other than petitioners' self-serving statement on Form 8283.[9] Under these circumstances the Court is unable to estimate any allowance, see Cohan v. Commissioner, 39 F.2d at 543-544, for to do so would amount to unguided largesse, see Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Accordingly, the Court holds that petitioners are not entitled to a deduction for any contribution of property.

_____

[9] The fact that a taxpayer reports an expense on the taxpayer's income tax return and attaches some IRS-prescribed form in support of that deduction is not sufficient to substantiate the deduction claimed on the return. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974). A tax return is merely a statement of the taxpayer's claim; the return is not presumed to be correct. Wilkinson v. Commissioner, 71 T.C. at 639; Roberts v. Commissioner, 62 T.C. at 837; see also Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957) (stating that a taxpayer's income tax return is a self-serving declaration that may not be accepted as proof for the deduction or exclusion claimed by the taxpayer); Halle v. Commissioner, 7 T.C. 245 (1946) (stating that a taxpayer's return is not self-proving as to the truth of its contents), aff'd, 175 F.2d 500 (2d Cir. 1949).

B.  Unreimbursed Employee Expenses

Petitioners contend that "regardless of the length of the contract" between petitioner and Student Resources, "all expenses incurred in Florida away from the principal residence in Arizona of $35,075 are considered business expenses".  In contrast, respondent contends that petitioner's employment with Student Resources was indefinite, such that the Florida expenses are nondeductible.

As a general rule, personal, living, and family expenses are nondeductible. Sec. 262(a); secs. 1.162-2(a), (e), 1.262-1(b)(5), Income Tax Regs.  However, section 162(a)(2) allows a taxpayer to deduct ordinary and necessary travel expenses (including meals and lodging) paid or incurred while away from home in pursuit of a trade or business.  Commissioner v. Flowers, 326 U.S. 465, 470 (1946).

The reference to "home" in section 162(a)(2) means the taxpayer's "tax home".[10]  Mitchell v. Commissioner, 74 T.C. 578, 581 (1980); Foote v. Commissioner, 67 T.C. 1, 4 (1976); Kroll v. Commissioner, 49 T.C. 557, 561-562 (1968).  As a general rule, a taxpayer's principal place of employment is his tax

_____

[10] The vocational "tax home" concept was first construed by this Court in Bixler v. Commissioner, 5 B.T.A. 1181, 1184 (1927), and has been steadfastly upheld by this Court.  See, e.g., Horton v. Commissioner, 86 T.C. 589 (1986); Leamy v. Commissioner, 85 T.C. 798 (1985); Foote v. Commissioner, 67 T.C. 1 (1976); Kroll v. Commissioner, 49 T.C. 557 (1968).

home, not where his personal residence is located, if different from his principal place of employment. Mitchell v. Commissioner, 74 T.C. at 581; Kroll v. Commissioner, 49 T.C. at 561-562. If a taxpayer for personal reasons chooses to reside in a different location than that of his principal place of employment, his residence is not recognized as his home for tax purposes. Jones v. Commissioner, 54 T.C. 734, 740 (1970), aff'd, 444 F.2d 508 (5th Cir. 1971).

An exception to the general rule exists where a taxpayer accepts temporary, rather than indefinite, employment away from his personal residence. In that case, the taxpayer's personal residence may be his tax home. Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958).

Employment is temporary if its termination can be foreseen within a fixed or reasonably short period of time. Mitchell v. Commissioner, 74 T.C. at 581; Stricker v. Commissioner, 54 T.C. 355, 361 (1970), aff'd per curiam, 438 F.2d 1216 (6th Cir. 1971). Employment that merely lacks permanence is indefinite unless termination is foreseeable within a short period of time. Norwood v. Commissioner, 66 T.C. 467, 470 (1976); Kroll v. Commissioner, 49 T.C. at 562. Further, section 162(a) expressly provides that the taxpayer shall not be treated as being temporarily away from home during any period of employment if such period exceeds one year.

In the instant case, when petitioner was hired by Student Resources, his employment was expected to last 2½ years, or until June 30, 2007. In point of fact, petitioner was on the ground working as controller for Student Resources at its office in St. Petersburg on a full-time basis from January 17, 2005, through August 31, 2006, a period of 19½ months. Upon concluding his employment, petitioner received not only a success bonus but also salary paid through June 30, 2007, and he remained in Clearwater for another month or so before returning to Arizona. Under these circumstances, petitioner's employment with Student Resources was, for tax purposes, indefinite and not temporary. See sec. 162(a), (flush language) ("[T]he taxpayer shall not be treated as being temporarily away from home during any period of employment if such period exceeds 1 year."). Accordingly, rent, utilities, and housekeeping costs and services for petitioner's Clearwater apartment are personal and nondeductible. See sec. 262(a). Similarly, the commuting costs between petitioner's Clearwater apartment and his place of employment in St. Petersburg, as well as airfare between Florida and Arizona (whether for petitioner or Mrs. Koriakos), are personal and nondeductible. See id.

This leaves "meals and entertainment expenses" of $2,500 which, according to petitioner, represented "the cost of eating out and hosting business meals once or twice a month" while in Florida. To the extent that the $2,500 represents the

cost of "eating out" as opposed to "eating in", such cost is personal and nondeductible.  See id.  To the extent that the $2,500 represents business meals, such cost is not deductible because it is unsupported by strict substantiation as mandated by section 274(d), discussed infra.[11]

In sum, the Court holds that petitioners are not entitled to any deduction for "unreimbursed employee expenses".

III.  Deductions Claimed on Petitioners' Schedule C for Real Estate Business

As previously stated, if, in the absence of adequate records, a taxpayer provides sufficient evidence that the taxpayer has paid a deductible expense but is unable to adequately substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of such expense and allow the deduction to that extent.  Cohan v. Commissioner, 39 F.2d at 543-544.  However, for the Court to do so, there must be some basis upon which an estimate may be made, for otherwise any allowance would amount to unguided largesse.  Williams v. United States, 245 F.2d at 560-561; Vanicek v. Commissioner, 85 T.C. at 742-743.

---

[11] The $2,500 is obviously an estimate.  Although petitioners may have shredded their records, they claim to have done so after they filed their 2006 return.  Thus, whatever records petitioners may have had were in their possession at the time that their return was prepared and filed.

Section 274(d) prescribes more stringent substantiation requirements that must be satisfied before a taxpayer may deduct certain categories of expenses, including travel, meals and entertainment, gifts, and expenses related to the use of listed property as defined in section 280F(d)(4)(A). See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969). As relevant here and for 2006, the term "listed property" includes any passenger automobile, any computer or peripheral equipment, or any cellular telephone (or other similar telecommunications equipment). Sec. 280F(d)(4)(A)(i), (iv), (v).

To satisfy the requirements of section 274(d), a taxpayer generally must maintain adequate records or produce sufficient evidence corroborating his own statement, establishing the amount, date, and business purpose of an expenditure or business use of property. Sec. 1.274-5T(b)(6), (c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985). The Court may not use the Cohan doctrine to estimate expenses covered by section 274(d). Sanford v. Commissioner, 50 T.C. at 827; sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

A. Deductions Subject to Section 274(d)

On their 2006 Schedule C for St. Mary Realty & Business Brokerage, petitioners claimed various deductions for expenses whose deductibility is

governed by section 274(d), e.g., car expenses, meals and entertainment, cellular telephone service. Yet petitioners produced no records sufficient to substantiate these expenses. See sec. 1.274-5T(a), Temporary Income Tax Regs., supra. Petitioners contend that their failure to do so should be excused by the fact that they shredded the requisite substantiation incident to relocating from Arizona to Florida in 2007.

If a taxpayer's records have been destroyed or lost because of circumstances beyond the taxpayer's control, such as fire, flood, earthquake, or other casualty, the taxpayer may substantiate the deduction by "reasonable reconstruction" of his or her expenses, see sec. 1.274-5T(c)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985), and should do so to the fullest extent possible, e.g., Roumi v. Commissioner, T.C. Memo. 2012-2; Chong v. Commissioner, T.C. Memo. 2007-12.

According to petitioners, they shredded their records. But even if such happenstance was inadvertent, it was not a circumstance beyond their control, and they must accept the consequences of their carelessness. Consequently, section 1.274-5T(c)(5), Temporary Income Tax Regs., supra, affords no relief. But, even if petitioners came within the relief afforded by such action, they have made no serious and persuasive effort to reconstruct their expenses. Further, the deductions

for travel ($750) and meals and entertainment ($250) appear to be estimates in the first instance, as does the deduction for car expenses (consisting principally of standard mileage allowance × 300 miles/week × 50 weeks). See supra note 12. Finally, although petitioners did produce some airfare receipts for flights between Arizona and Florida, any suggestion that Mrs. Koriakos flew from Phoenix to Tampa principally "to discuss real estate issues with * * * [petitioner] as the broker" is singularly unpersuasive.

In sum, petitioners are not entitled to a deduction for any expense subject to the strict substantiation requirements of section 274.

B.  Deductions Not Subject to Section 274

We turn now to petitioners' Schedule C deductions that are not subject to section 274.  Although strict substantiation is not required, petitioners are still obliged to substantiate the expenses that they wish to deduct.  See supra notes 9 and 10.

We begin with the $5,500 deduction for "office expense", for it is illustrative of the shortcomings in the evidentiary record that inform our ultimate holding.  Thus, according to petitioners, this deduction represents $3,000 for telecommunications and $2,500 for unidentified "one time expenses".  Insofar as the latter are concerned, petitioners speculate that such unidentified expenses may

be for "this" or may be for "that". But if petitioners do not know for sure and are left to guess what expense they are seeking to deduct, any allowance under the Cohan doctrine is foreclosed. See Williams v. United States, 245 F.2d at 560-561; Vanicek v. Commissioner, 85 T.C. at 742-743.

Insofar as telecommunications is concerned, the record is devoid of evidence that would permit an allocation of expenses between cellular telephone service, which is (as previously discussed) subject to section 274, and other service, which is not. Regarding the latter, section 262(b) expressly treats as a nondeductible personal expense any charge (including taxes thereon) for basic local telephone service with respect to the first telephone line provided to any residence of the taxpayer. Petitioners may have had a second line to their residence; but if so, the record provides no basis on which an allocation of cost might be made. As before, the Court is left to guess. See Williams v. United States, 245 F.2d at 560-561; Vanicek v. Commissioner, 85 T.C. at 742-743.

In general, petitioners ask to be excused from shortcomings such as these because their records were shredded. But it was petitioners themselves who shredded their records, carelessly or otherwise; and, as previously stated, petitioners must accept responsibility for the consequences of their action. In any event, petitioners fail to adequately explain why they could not have reconstructed

their records by contacting relevant third parties, such as their telephone company and Internet service provider, the Arizona and Florida Board of Realtors, Arizona and Florida MLS, the AICPA,[12] and the sponsors of the real estate courses that they may have attended. Similarly, petitioners fail to adequately explain why they could not have obtained copies of their checking account statements from their financial institutions in order to substantiate payment of expenses.

Notwithstanding the foregoing, the record is not so devoid of evidence as to preclude us from making an estimate in respect of certain of the deductions in issue. See Cohan v. Commissioner, 39 F.2d at 543-544. Accordingly, bearing heavily against petitioners whose inexactitude is of their own making, the Court holds that they are entitled to Schedule C deductions for "advertising expenses" of $50, for "repairs and maintenance" of $50, for "supplies" of $100, for "taxes and licenses" of $500, and for "other expenses" of $500, for a total allowance of $1,200. See id.

---

[12] It is not clear how petitioner's AICPA dues would be relevant to a real estate business. However, respondent has not raised the matter, and we do not pursue it.

## IV. Cancellation of Indebtedness Income for 2008

### A. Sections 108 and 163

Section 61(a)(12) provides the general rule that gross income includes income from the cancellation (or discharge) of indebtedness. See United States v. Kirby Lumber, Co., 284 U.S. 1, 3 (1931); sec. 1.61-12(a), Income Tax Regs. The includible amount is the difference between the face value of the debt and the amount paid in satisfaction of the debt. Babin v. Commissioner, 23 F.3d 1032, 1034 (6th Cir. 1994), aff'g T.C. Memo. 1992-673; Rios v. Commissioner, T.C. Memo. 2012-128, 2012 WL 1537910, at *4. Thus, unless an exclusion applies, petitioners realized income from the cancellation of indebtedness attributable to the Wells Fargo line of credit. See secs. 61(a)(12), 108(a); sec. 1.1001-2(a)(2), Income Tax Regs.

Petitioners do not dispute that the $146,850 debt arising from the Wells Fargo line of credit was canceled. Rather, petitioners contend that the statutory exclusion for "qualified principal residence indebtedness" serves to exclude the cancellation of such debt from gross income. See sec. 108(a)(1)(E), (h).[13]

---

[13] Sec. 108(a)(1)(E) and (h) was added by the Mortgage Forgiveness Debt Relief Act of 2007, Pub. L. No. 110-142, sec. 2(a), (b), and (c), 121 Stat. at 1803, and applies to the discharge of indebtedness on or after January 1, 2007.

For purposes of section 108, "qualified principal residence indebtedness" has the same meaning as "acquisition indebtedness" in section 163(h)(3)(B). Sec. 108(h)(2). "Acquisition indebtedness" means indebtedness incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer, which is secured by such residence. See 163(h)(3)(B). A "qualified residence" is defined as a principal residence under section 121. Sec. 163(h)(4)(A)(i)(I). Section 108(h)(5) also makes clear that "principal residence" as used in section 108 has the same meaning as in section 121.[14] Sec. 108(h)(5). Respondent does not dispute that the Florida home became petitioners' principal residence. Therefore, petitioners must show that the Wells Fargo line of credit was used to acquire, construct, or substantially improve the same property that secured the line of credit. See secs. 108(a)(1)(E), (h), 163(h)(3)(B).

In the instant case, petitioners obtained a line of credit from Wells Fargo in the amount of $146,850. Petitioners drew on the line of credit and used the loan proceeds to purchase the Florida home. However, the line of credit was secured

---

[14] The Code does not define "principal residence". Whether a residence qualifies as a taxpayer's principal residence for purposes of sec. 121 is a question of fact that is resolved with reference to all the facts and circumstances. Sec. 1.121-1(b)(2), Income Tax Regs.; see also Wickersham v. Commissioner, T.C. Memo. 2011-178, 2011 WL 3241353, at *8 (citing Farah v. Commissioner, T.C. Memo. 2007-369).

by the Arizona home and not by the Florida home. As previously discussed and as relevant herein, section 163(h)(3)(B)(i) specifically requires that "acquisition indebtedness" be secured by the residence it is being used to acquire. Thus, because petitioners used the line of credit that was secured by the Arizona home to acquire the Florida home, section 163(h)(3)(B)(i)(II) has not been satisfied and the Wells Fargo line of credit does not constitute qualified principal residence indebtedness within the meaning of section 108(a)(1)(E). Accordingly, section 108 does not serve to exclude the discharge of indebtedness from petitioners' income for 2008.

B. Section 121 Not Applicable

Petitioners also argue that section 121 applies to exclude the discharged indebtedness from their income. Section 121 provides for the exclusion from gross income of up to $250,000 of gain from the sale or exchange of property if the property was owned and used as the taxpayer's principal residence for periods aggregating two years or more during the five-year period preceding the sale or exchange. Sec. 121(a) and (b)(1). A husband and wife filing a joint return may exclude from gross income up to $500,000 of the gain if at least one spouse meets the ownership requirement and both spouses meet the use requirement of section 121(a). Sec. 121(b)(2).

Petitioners' reliance on section 121 is misplaced. Section 1.1001-2(a)(2), Income Tax Regs., provides: "[t]he amount realized on a sale * * * of property that secures a recourse liability does not include amounts that are * * * income from the discharge of indebtedness under section 61(a)(12)." We have already found that the $146,850 reflected on the Form 1099-C from Wells Fargo is from discharge of indebtedness in respect of a recourse liability; consequently, this amount is not included in the amount realized on the sale of the Arizona home. Sec. 1.1001-2(a)(2), Income Tax Regs. Because the canceled debt is not considered gain from the sale of the Arizona home, section 121 does not apply to exclude the $146,850 of canceled debt from petitioners' income for 2008. We therefore sustain respondent on this issue.

## V. Accuracy-Related Penalty for 2006

Section 6662(a) and (b)(2) imposes an accuracy-related penalty equal to 20% of the amount of any underpayment of tax that is attributable to a substantial understatement of income tax. By definition an understatement is the excess of the tax required to be shown on the tax return over the tax actually shown on the return. Sec. 6662(d)(2)(A). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

With respect to a taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is appropriate to impose the penalty. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

In the instant case petitioners reported total tax of $8,165 for 2006. The notice of deficiency determined petitioners' correct tax was $21,436 for that year. However, because of our holdings allowing some deductions for Schedule A cash contributions and some Schedule C business expenses, petitioners' correct tax must be redetermined. If, after the Rule 155 computation, the correct tax is of an amount such that there is a substantial understatement of income tax for 2006, then respondent will have satisfied his burden of production. If so, as we shall assume in order to complete the requisite analysis of this issue, petitioners would bear the burden of showing that the penalty does not apply. See Higbee v. Commissioner, 116 T.C. at 446-447.

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty with respect to any portion of an underpayment if the taxpayer

establishes that there was reasonable cause for such portion, and the taxpayer acted in good faith with respect to such portion. The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account the pertinent facts and circumstances, including the taxpayer's knowledge, education, and experience, as well as the taxpayer's reliance on professional advice. Thomas v. Commissioner, T.C. Memo. 2013-60; see also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Humphrey, Farrington & McClain, P.C. v. Commissioner, T.C. Memo. 2013-23; sec. 1.6664-4(b)(1), Income Tax Regs.

Nothing in the record suggests that petitioners consulted with a professional adviser before self-preparing their 2006 income tax return. Furthermore, petitioner is a C.P.A. and holds an M.B.A. degree. As a highly credentialed individual with a very responsible position in the business world, petitioner should have been well aware of the importance of maintaining adequate records or, in their absence, of reconstructing such records, in order to comply with Code requirements. He should also have been well aware of the fact that personal and living expenses are generally not deductible.

Although we may be reluctant to question good faith, petitioners have not convincingly demonstrated that they acted with reasonable cause in claiming the deductions at issue in this case. Accordingly, if there is a substantial understatement of income tax for 2006, petitioners shall be liable for the accuracy-related penalty for that year.

## Conclusion

In deciding the disputed issues, the Court has considered all of the arguments advanced by the parties and, to the extent not expressly addressed, those arguments do not support any result contrary to those reached herein.

To give effect to our disposition of the disputed issues, as well as petitioners' concession, see supra note 3,

Decision will be entered

under Rule 155.