148 T.C. No. 24

UNITED STATES TAX COURT

JEREMY M. JACOBS AND MARGARET J. JACOBS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19009-15.                          Filed June 26, 2017.

Ps own the Boston Bruins (Bruins), a National Hockey League franchise based in Boston, Massachusetts. During the taxable periods in issue the Bruins played approximately one-half of their hockey games at their home arena in Boston and approximately one-half of their hockey games at away city arenas throughout the United States and Canada. The Bruins stayed at hotels when visiting away cities and contracted with the hotels for the provision of pregame meals to players and team personnel. Ps deducted the full cost of pregame meals furnished to Bruins' players and personnel. R issued to Ps a notice of deficiency, determining that the cost of pregame meals was subject to the 50% limitation of I.R.C. sec. 274(n)(1).

Held: Ps' provision of pregame meals to Bruins' players and personnel at away city hotels qualifies as a de minimis fringe under I.R.C. sec. 274(n)(2)(B), and therefore the cost of such meals is not subject to the 50% limitation of I.R.C. sec. 274(n)(1).

Sean M. Akins, Jeremy D. Spector, and Lauren A. Ross, for petitioners.

Leon St. Laurent and Randall S. Trebat, Jr., for respondent.

RUWE, Judge:  Respondent determined deficiencies of $45,205 and $39,823 in petitioners' Federal income tax for the taxable years 2009 and 2010, respectively.  The sole issue for decision is whether Deeridge Farms Hockey Association (Deeridge), a subchapter S corporation owned directly or indirectly by petitioners, is entitled to deductions for the full amounts of expenses incurred in providing meals to professional hockey players and team personnel at hotels in cities other than Boston, Massachusetts, or whether the deduction for meal expenses is limited to 50% under section 274(n)(2).[1]

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1]On December 16, 2016, respondent filed with the Court a motion to strike requesting that exhibit 1 attached to petitioners' reply brief along with certain portions of the reply brief be stricken.  On January 19, 2017, pursuant to an order of the Court, petitioners filed a response objecting to respondent's motion to strike.  We will issue a separate order denying respondent's motion to strike.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, and first amended second stipulations of fact and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in New York. Petitioners are the owners of the Boston Bruins (Bruins or team), a National Hockey League (NHL) franchise based in Boston, Massachusetts. Petitioners own the Bruins through three entities: Deeridge, Manor House Hockey Association, LLC (Manor House), and the Boston Professional Hockey Association, Inc. (BPHA). Deeridge was incorporated on July 10, 2001, and has been a subchapter S corporation since its election on January 1, 2002. During the taxable years in issue petitioner Jeremy M. Jacobs owned 99% of Deeridge and petitioner Margaret J. Jacobs owned 100% of Manor House, which in turn owned 1% of Deeridge. Deeridge wholly owned BPHA, which is a Massachusetts corporation. On January 1, 2002, Deeridge elected to treat BPHA as a qualified subchapter S corporation. BPHA owns and operates the Bruins.

The NHL and the Bruins

The NHL is a professional ice hockey league formed in 1917. During the years in issue the NHL consisted of 30 hockey teams based throughout the United

States and Canada. The NHL is divided into two conferences: the Eastern Conference and the Western Conference. The Eastern Conference is subdivided into three divisions (the Atlantic, the Northeast, and the Southeast), and the Western Conference is subdivided into three divisions (the Pacific, the Central, and the Northwest). During the years in issue the Bruins were members of the Eastern Conference's Northeast Division. The Bruins are one of the oldest and most successful teams in the NHL. Since 1924, when the Bruins first joined the NHL, they have won the Stanley Cup (i.e., the NHL's championship) on six separate occasions. As part of their business model, the Bruins' goal is to win as many hockey games as possible.

NHL Scheduling

An NHL season typically begins in September and concludes in June of the following year. NHL seasons consist of preseason games, regular season games, and postseason games. Preseason games are played in September and early October, regular season games are played in October through mid-April, and postseason games are played from mid-April through June. Each NHL team plays a total of 82 regular season games per season: 41 games at its hometown arena[2]

_____

[2]The Bruins' home arena for the taxable years in issue was the TD Garden in Boston, Massachusetts, and their practice and training facility was the Ristuccia

(continued...)

(home games) and 41 games at arenas in different cities (away games). The NHL Commissioner's office establishes the schedule for each season in consultation with NHL teams. The NHL constitution and bylaws obligate NHL teams to play regular season home and away games. Eight NHL teams from each conference qualify for the postseason on the basis of their regular season performance, and the NHL constitution and bylaws obligate each playoff team to play both home and away games during the postseason.

The NHL requires teams to arrive in the away city at least six hours before the start of an away game.[3] The collective bargaining agreement (CBA)--which binds the NHL, member teams, and players of member teams--requires that an NHL team travel to an away city the day before game day if the flight to the away city is greater than 150 minutes. If an NHL team fails to participate in a scheduled away game it must forfeit the game, lose playoff points, incur financial penalties

---

[2](...continued)
Memorial Arena in Wilmington, Massachusetts.

[3]The Bruins usually travel to away city preseason games on the day of the game because the NHL does not require earlier arrival and preseason games have no playoff implications.

from the NHL, and indemnify the home team for loss of revenue and other expenses.[4]

Bruins' Traveling Arrangements

During the years in issue the Bruins traveled to away games with various personnel, which typically included:  between 20 and 24 players, the head coach, assistant coaches, medical personnel, athletic trainers, equipment managers, communications personnel, travel logistics managers, public relations/media personnel, and other employees (traveling hockey employees).  During the years in issue the Bruins' traveling hockey employees traveled to every away game.

The Bruins begin to identify and contract with prospective away city hotels soon after the NHL releases the game schedule, which is typically months before the season starts.  The contracts between the Bruins and away city hotels provide for sleeping accommodations and banquet or conference rooms (meal rooms) where pregame meals and snacks are served.  The Bruins select the away city hotels on the basis of the location, level of service provided by the hotel, and

---

[4]Pursuant to the NHL constitution, the Bruins receive 100% of revenues from regular season ticket sales for home games and no revenues from regular season ticket sales for away games.  The Bruins' away games are telecast on the New England Sports Network, and BPHA earns a rights fee for the telecast.

quality of food served for the pregame meals.[5]  If the hotel sufficiently meets the

Bruins' needs, the team will typically return to the same establishment for future

games in the same season or in subsequent seasons.

Each away city hotel prepares pregame meals (i.e., breakfast, lunch, or

brunch) and snacks that meet the players' specific nutritional guidelines to ensure

optimal performance for the upcoming game and throughout the remainder of the

season.  The Bruins contract in advance with each away city hotel for the

provision of pregame meals and snacks, and the food is made available to all

traveling hockey employees.  The Bruins initiate the meal contracting process by

providing a custom meal menu to the prospective away city hotel requesting

specific types and quantities of food.  The Bruins tend to keep food options

consistent at each away city hotel to avoid players' having gastric problems during

the game.  The Bruins always order the same quantity of food to feed all traveling

hockey employees.  Using this custom meal menu the hotel prepares and sends to

---

[5]The Bruins typically request certain concessions from the away city hotels, including:  (1) a table with keys for prekeyed rooms for expedited check-in; (2) late checkout corresponding to the game time; (3) no game day housekeeping, to prevent disturbing player rest; (4) a complimentary suite for the head coach; (5) suite upgrades for the GM, president, athletic trainers, and onsite travel coordinator; and (6) no fee for the meal room.  When the Bruins are visiting cities that are home to other Eastern Conference teams, the hotel contracts usually will include a provision guaranteeing room availability should the Bruins qualify for the postseason.

the Bruins a banquet event order (BEO) which sets forth the date, time, meal room, number of guests, menu, and pricing for each pregame meal. The BEOs typically list fewer anticipated meal attendees than the actual number of meal attendees for cost reduction reasons. If the BEO deviates from the custom meal menu, the Bruins contact the hotel to have the discrepancy corrected. Once the BEO meets the Bruins' needs, the team accepts the offer set forth in the BEO by executing the document and returning it to the hotel for a countersignature.

The meal room is provided to the Bruins at no extra cost, and the meal rooms are set up similarly at each hotel--usually round tables with chairs and buffet stations where food and beverages are available for self-service. For privacy reasons, the Bruins request that the location of the meal room not be disclosed to the public, and the meal room is accessible only to traveling hockey employees, waiters, waitresses, and dining captains.

The Day Before an Away Game

On the day before an away game the Bruins' traveling hockey employees take a charter flight to the away city and check in to the away city hotel. Bruins players have an 11 p.m. curfew on the night before a game. Depending on how early the team arrives on the day before an away game, the players will use the

time before curfew to eat a meal, rest, receive treatments from the training staff, or complete strength and conditioning workouts.

Game Day Morning

On the morning of an evening[6] away game the Bruins players have a mandatory breakfast between 8 and 10 a.m. The pregame breakfast takes place in the meal room assigned to the team by the hotel pursuant to the terms of the contract entered into by the Bruins and the hotel. The traveling hockey employees are provided an itinerary for each away game which details the time and location of meals. Breakfast is made available to all traveling hockey employees, and attendance is mandatory for all players. Players may be fined or scratched from participating in games if they are late to or absent from breakfast.

Aside from nutrition, breakfast also provides the Bruins with a chance to conduct team business. Bruins players will meet with coaches during breakfast--either one-on-one or in small groups--to discuss strategy and review game film. The public relations staff also attends breakfast, where they meet with players concerning anticipated media inquiries, interviews, or other public-facing issues. Bruins players also meet with staff at breakfast to receive game tickets for family

---

[6]As discussed more fully infra p. 11, the Bruins will occasionally play away games in the afternoon rather than in the evening. On these occasions the meal schedule will differ.

and friends. Coaches, trainers, and management also use breakfast to meet amongst themselves and make roster adjustments because of illness, injury, strategy, or performance issues. Following breakfast the Bruins typically board a charter bus and travel to the opponent's arena or practice facility to practice for the upcoming game. On occasion, if the head coach determines that players are fatigued and in need of extra rest, the team will skip its postbreakfast practice and instead conduct meetings at the hotel to review game film and discuss strategy.

Game Day Afternoon

When the Bruins return from the postbreakfast practice they have lunch between 12:15 and 2:15 p.m. local time, which, like breakfast, is made available to all traveling hockey employees. Lunch is identified in the Bruins' travel itinerary and is held in the designated meal room, and attendance is mandatory for all players. At lunch the Bruins' coaches may conduct small group and/or one-on-one meetings with players, and the public relations staff may meet with players to discuss anticipated media inquiries, interviews, and public-facing issues.

After lunch Bruins' players are afforded free time, which is usually used to rest before the game. The Bruins are also provided an afternoon snack, which generally is between 3:15 and 5:15 p.m. local time, before evening away games. Like breakfast and lunch, the pregame snack is identified in the travel itinerary and

takes place in the designated meal room.  However, unlike breakfast and lunch, it is not mandatory for Bruins' players to attend or eat the pregame snack.

Afternoon Game Schedule

On certain occasions the Bruins will play away games in the afternoon rather than the evening, and the abovementioned schedule will be altered.  In these instances a pregame brunch replaces both the breakfast and lunch held in advance of evening games.  The pregame brunch takes place between 8 a.m. and 12:30 p.m., depending on the time of the afternoon game.  As with breakfast and lunch preceding away evening games, the pregame brunch before away afternoon games is made available to all traveling hockey employees, is mandatory for Bruins' players, is identified in the travel itinerary, and involves meetings, strategy sessions, film review, and other game preparation and media-related activities.

Other Hotel Activities

In addition to lodging, meals, and meetings, the Bruins use away hotels for other team-related activities.  For instance, the team's athletic trainers use hotel space to provide players with medical treatment, physical therapy, massages, and strength and conditioning training.  It is important that each Bruins player receive proper medical treatment and strength and conditioning training to decrease the likelihood of injury and maximize athletic performance.  The treatments and

strength and conditioning training are provided to the players in different areas of the away city hotel, including suites, player rooms, the fitness center, and the pool and hot tubs.

Game and Postgame Activities

After the pregame snack (or brunch in the case of an afternoon away game) and two hours and 25 minutes before game time the Bruins' traveling hockey employees board a charter bus and depart for the opponent's arena. Upon arrival at the opponent's arena the players stretch and dress in their uniforms for the game. An NHL game consists of 60 minutes of playing time and lasts approximately 150 minutes from start to finish. After the conclusion of the game the Bruins will typically remain at the opponent's arena for approximately one hour to shower, change clothes, and meet with the media. The Bruins' traveling hockey employees then board a charter bus and travel to the airport to fly back to Boston or to the next away city.

Tax Returns

Petitioners timely filed their Federal income tax returns for the taxable years 2009 and 2010. Deeridge electronically filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for the taxable years 2009 and 2010, claiming meal

expense deductions of $255,754 and $284,446, respectively, for pregame meals provided to the Bruins' traveling employees while at away city hotels.

Respondent issued a notice of deficiency dated April 28, 2015, determining deficiencies of $45,205 and $39,823 in petitioners' Federal income tax for the taxable years 2009 and 2010, respectively. The deficiencies result from respondent's disallowance of 50% of Deeridge's claimed deductions for meal expenses provided to the Bruins' traveling hockey employees in cities other than Boston.[7] Petitioners timely filed a petition with this Court disputing respondent's determination.

OPINION

The issue for decision is whether petitioners, through BPHA and Deeridge, are entitled to deduct the full cost of pregame meals provided to the Bruins' traveling hockey employees while at away city hotels, or, alternatively, whether section 274(n)(1) limits this deduction to 50% of the expenses for such meals. Petitioners argue that section 274(n) does not limit deductions for the cost of pregame meals provided at away city hotels because the meals qualify as: (1) a de minimis fringe under section 274(n)(2)(B), and, alternatively, (2) an expense for

_____

[7]Respondent's adjustments in the notice of deficiency do not disallow claimed meal expense deductions associated with meals provided to the Bruins' players and staff at the TD Garden in Boston, Massachusetts.

entertainment sold to customers under section 274(n)(2)(A). Respondent argues that none of the exceptions to section 274(n) applies to the Bruins' provision of pregame meals and therefore the 50% limitation applies.

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and the taxpayers bear the burden of proving that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayers bear the burden of proving that they are entitled to the claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice, Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 274(a)(1)(A) disallows a deduction for certain meal and entertainment expenses otherwise deductible under section 162 unless the expenses are associated with the active conduct of the taxpayer's trade or business. Respondent does not challenge that the Bruins' pregame meal expenses are associated with the active conduct of petitioners' trade or business.

If the deduction for meal expenses is not disallowed by section 274(a)(1)(A), then section 274(n) imposes a 50% limitation on the deduction for

meal expenses unless an exception applies.  Section 274(n) provides, in pertinent

part:

> SEC. 274(n).  Only 50 Percent of Meal and Entertainment
> Expenses Allowed as Deduction.--
>
> > (1) In general.--The amount allowable as a deduction
> > under this chapter for--
> >
> > > (A) any expense for food or beverages, and
> > >
> > > (B) any item with respect to an activity which is of
> > > a type generally considered to constitute entertainment,
> > > amusement, or recreation, or with respect to a facility
> > > used in connection with such activity,
> >
> > shall not exceed 50 percent of the amount of such expense or
> > item which would (but for this paragraph) be allowable as a
> > deduction under this chapter.
> >
> > (2) Exceptions.--Paragraph (1) shall not apply to any
> > expense if--
> >
> > > (A) such expense is described in paragraph (2),
> > > (3), (4), (7), (8), or (9) of subsection (e).
> > >
> > > (B) in the case of an expense for food or
> > > beverages, such expense is excludable from the gross
> > > income of the recipient under section 132 by reason of
> > > subsection (e) thereof (relating to de minimis fringes),

Petitioners argue that the Bruins' provision of pregame meals to traveling hockey

employees at away city hotels qualifies for the de minimis fringe exception under

section 274(n)(2)(B), or, alternatively, as expenses for entertainment sold to

customers under section 274(n)(2)(A).[8] We first address petitioners' argument that pregame meals meet the de minimis fringe exception.

## I. De Minimis Fringe Exception

Petitioners are entitled to deduct the full cost of pregame meals provided to the Bruins' traveling hockey employees if the meals meet the de minimis fringe exception. See secs. 274(n)(2)(B), 132(e).[9]

As a preliminary matter, section 132(e)(2) requires that "access to the [eating] facility is available on substantially the same terms to each member of a group of employees which is defined under a reasonable classification set up by the employer which does not discriminate in favor of highly compensated employees." For the years in issue a highly compensated employee was one who received compensation exceeding $110,000. See sec. 132(j)(6); Notice 2009-94, 2009-50 I.R.B. 848, 848; Notice 2008-102, 2008-2 C.B. (Vol. 2) 1106, 1106. The Bruins provided pregame meals to all traveling hockey employees, and we find

---

[8]Sec. 274(n)(2)(A) cross-references sec. 274(e)(8), which provides:

(8) Entertainment sold to customers.--Expenses for goods or services (including the use of facilities) which are sold by the taxpayer in a bona fide transaction for an adequate and full consideration in money or money's worth.

[9]Sec. 132(l) does not affect this case because it specifically has no application to sec. 132(e).

this classification (i.e., Bruins employees traveling to away cities to perform business duties) to be a reasonable classification given the nature of the team's business. Petitioners provided credible testimony that the pregame meals were made available to all Bruins' traveling hockey employees--highly compensated, nonhighly compensated, players, and nonplayers--on substantially the same terms. Petitioners also provided testimony, which we find credible, that any discrepancy between anticipated and actual meal attendees was a function of cost reduction concerns and not discrimination. We therefore hold that the Bruins' provision of pregame meals to traveling hockey employees satisfies the nondiscriminatory manner requirement of section 132(e)(2).

Employee meals provided in a nondiscriminatory manner constitute a de minimis fringe under section 132(e) if: (1) the eating facility is owned or leased by the employer; (2) the facility is operated by the employer; (3) the facility is located on or near the business premises of the employer; (4) the meals furnished at the facility are provided during, or immediately before or after, the employee's workday; and (5) the annual revenue derived from the facility normally equals or exceeds the direct operating costs of the facility (the revenue/operating cost test). Sec. 132(e)(2); Boyd Gaming Corp. v. Commissioner, 106 T.C. 343, 348 (1996); sec. 1.132-7(a), Income Tax Regs. We will address each requirement in turn.

A.  Eating Facility Is Owned or Leased by Employer

For employee meals at an employer-operated eating facility to qualify as a de minimis fringe under sections 274(n)(2)(B) and 132(e), the regulations require that the employer-operated eating facility be "owned or leased by the employer".[10] Sec. 1.132-7(a)(2)(i), Income Tax Regs.  The regulations do not define the word "lease".  "It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'"  Sandifer v. U.S. Steel Corp., 571 U.S. ___, ___, 134 S. Ct. 870, 876 (2014) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)); Payless Cashways, Inc. v. Commissioner, 114 T.C. 72, 77-78 (2000).  A lease is commonly defined as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration".  Black's Law Dictionary 970 (9th ed. 2009).

Although the BEOs and hotel contracts entered into between the Bruins and the away city hotels are not specifically identified as "leases", the substance of these contracts indicates that the Bruins are paying consideration in exchange for "the right to use and occupy" the hotel meal rooms.  The Bruins' execute BEOs and hotel contracts with each away city hotel to occupy meal rooms and determine

---

[10]Petitioners do not contend that they own the away city hotel meal rooms.

what types of food are served, and the BEOs specify the dates and times of the meals and the anticipated number of attendees.  The Bruins do not provide separate consideration for the rental of the meal rooms; however, the meal rooms are essential to the Bruins' away city business operations, and the hotels agree to provide the meal rooms free of charge because the Bruins spend money for lodging and food.  The Bruins dictate several aspects regarding the setup of the meal rooms, such as the furnishings and the presence of audiovisual equipment or a whiteboard.  The Bruins also require the hotel to keep the location of the meal room private from the general public by refraining from posting any identifying information about the Bruins' use of the room.  The evidence establishes that the Bruins contract with away city hotels for the right to "use and occupy" meal rooms to conduct team business, and therefore these agreements are substantively leases.

B.  Operated by the Employer

For employee meals at an employer-operated eating facility to satisfy the de minimis fringe exception under section 132, the eating facility must be operated by the employer.  See sec. 1.132-7(a)(2)(ii), Income Tax Regs.  Section 1.132-7(a)(3), Income Tax Regs., provides the following guidance:

> (3) Operation by the employer.--If an employer contracts with another to operate an eating facility for its employees, the facility is considered to be operated by the employer for purposes of this

section. If an eating facility is operated by more than one employer, it is considered to be operated by each employer.

The Bruins contract with each away city hotel regarding the operation of the meal rooms as well as food preparation and service. Several weeks before the Bruins travel to the away city hotel they provide meal requirements to the hotel. The away city hotel then prepares a BEO setting forth the date, time, designated meal room, number of guests, menu, and per-person pricing for each meal ordered. The Bruins will either (1) contact the hotel if changes to the BEO are needed or (2) accept the offer set forth in the BEO by executing the BEO and returning it to the hotel for a countersignature. The BEOs also typically provide for the furnishings and setup of the meal room and the hotel staff that will assist in preparing and serving the food. The Bruins agree to pay a fee for each meal and a service fee of up to 22% of the cost of the meals. We find that by engaging in this process with away city hotels the Bruins are "contract[ing] with another to operate an eating facility for its employees".[11] See sec. 1.132-7(a)(3), Income Tax Regs.

---

[11]Respondent argues that petitioners have not substantiated that the Bruins contracted with away city hotels to operate meal rooms. Specifically respondent argues: "[P]etitioners did not note to the Court the repeated instances that the BEOs, as well as the eventual bills, checks, and invoices show sales taxes were imposed on the food charges. Such assessments demonstrate that the BEOs were not contracts for services, but instead, in form and substance, meal purchase orders." Respondent concludes that the operation of the away hotel meal rooms

(continued...)

C.  Business Premises

For employee meals at an employer-operated eating facility to qualify as a

de minimis fringe, section 132(e)(2) requires that the eating facility be "located on

or near the business premises of the employer".[12]  See also sec. 1.132-7(a)(2)(iii),

_____

[11](...continued)
do not reflect "the operation of an established and fixed food preparation and/or eating facility * * * but only the purchase of a few meals on an individual day to be held in a private room."  We find no merit to this argument.

[12]Sec. 119 provides, in pertinent part:

> SEC. 119(a).  Meals and Lodging Furnished to Employee, His Spouse, and His Dependents, Pursuant to Employment.--There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer, but only if--
>
> > (1) in the case of meals, the meals are furnished on the business premises of the employer, or
>
> > (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

The text of sec. 119 and sec. 132(e)(2) both use the phrase "business premises". However, the caselaw relevant to our analysis discusses "business premises" in the context of sec. 119 and not sec. 132(e)(2).  Because Congress has not directed us otherwise, we construe the phrase "business premises" to connote the same meaning in both Code provisions.  See W. Nat'l Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 359 (1994), aff'd, 65 F.3d 90 (8th Cir. 1995).  Neither party argues to the contrary.

Income Tax Regs. Congress intended a commonsense approach when making a determination regarding an employer's business premises. Lindeman v. Commissioner, 60 T.C. 609, 614 (1973). An employer's business premises is a place where employees perform a significant portion of duties or where the employer conducts a significant portion of business. Benninghoff v. Commissioner, 71 T.C. 216, 220 (1978), aff'd, 614 F.2d 398 (5th Cir. 1980). It is not necessary for an eating facility to be located in an employer's principal structure for it to be considered on the business premises. Id. Whether an eating facility is located on or near the business premises of an employer is a factual issue, and consideration must be given to the employee's duties as well as to the nature of the employer's business. Id. (citing Lindeman v. Commissioner, 60 T.C. at 615); see also Vanicek v. Commissioner, 85 T.C. 731, 739-740 (1985). An inquiry regarding business premises "infers a functional rather than spatial unity" and is not limited by questions of geography or quantum of business activities. Adams v. United States, 585 F.2d 1060, 1066 (Ct. Cl. 1978).

This is not the first time we have been asked to decide whether rented hotel space constitutes a taxpayer's business premises. In Mabley v. Commissioner, T.C. Memo. 1965-323, 1965 Tax Ct. Memo LEXIS 6, at *12-*13, we held that a rented hotel suite used for daily executive lunches constituted part of a company's

business premises. In <u>Mabley</u>, the Island Creek Coal Co. decided to hold daily executive luncheon conferences at a suite inside the Prichard Hotel to provide "for daily contact among the president and his staff members in order that all might keep informed as to the activities of all departments". <u>Id.</u>, 1965 Tax Ct. Memo LEXIS 6, at *4. The leased suite consisted of a dining room, a reception room, a toilet, and a closet. <u>Id.</u> at *5. The luncheon meetings were held at 12:30 p.m. (or sometimes began earlier or later) and lasted from one to three hours (and frequently lasted longer). Each staff member was required to attend the daily meetings. <u>Id.</u> at *5-*6. The Prichard Hotel agreed to provide the company meals from the hotel kitchen during regular mealtimes at current rates charged to hotel guests. <u>Id.</u> at *5. In holding that the hotel constituted the business premises of the company, we reasoned that "the rented hotel suite in which the meals were furnished was acquired and actually used for the conduct of business of the company, the furnishing of the meals being merely incidental." <u>Id.</u> at *12.

We conclude that away city hotels were part of the Bruins' business premises for the years in issue. In arriving at this conclusion we consider the traveling hockey employees' performance of significant business duties at away city hotels along with the unique nature of the Bruins' business (i.e., professional hockey). See <u>Vanicek v. Commissioner</u>, 85 T.C. at 739-740; <u>Benninghoff v.</u>

Commissioner, 71 T.C. at 220; Mabley v. Commissioner, 1965 Tax Ct. Memo LEXIS 6, at *12.  First and foremost, the nature of the Bruins' business requires the team to travel to various arenas across the United States and Canada, and it is not feasible for the Bruins to be a viable NHL franchise without participating in hockey games outside of Boston.  The NHL constitution and bylaws obligate each NHL team to play both home and away games during the regular season and, if the team qualifies, postseason games.  Not only does the NHL require teams to participate in away games, but it also requires visiting teams to arrive in an away city at least six hours before the away game commences.  The CBA imposes an additional requirement that visiting NHL teams travel to the away city the day before game day, if travel by airplane is greater than 150 minutes.  Furthermore, if an NHL team fails to participate in an away game it must forfeit the game, lose playoff points, incur financial penalties imposed by the NHL, and indemnify the home team for loss of revenue and other expenses.  Therefore, an integral part of the Bruins' professional hockey business involves traveling throughout the United States and Canada to play away games as dictated by the NHL schedule.  The job of the Bruins' team includes playing one-half of their regular season games away from their hometown arena, and the financial health of the NHL franchise--not to

mention the NHL itself--would be adversely affected if teams refused to play away games.

Staying in away city hotels is indispensable to the Bruins' preparation and is also necessary for maintaining a successful hockey operation and navigating the rigors of an NHL-mandated schedule. The Bruins are a highly respected professional hockey organization whose goals include fielding a competitive hockey team, winning as many regular season games as possible, qualifying for the postseason, and winning the Stanley Cup. The evidence adduced at trial establishes that away city hotels are essential to the Bruins' effective preparation, and like the taxpayer in Mabley, the Bruins use the hotel to conduct business. The away city hotels provide lodging so Bruins' players can obtain adequate rest, which is essential to professional athletes playing a physical sport with games scheduled in short succession. The Bruins contract with each away city hotel to set up a private meal room and to provide meals/snacks that meet the players' specific nutritional guidelines, which ensures optimal performance for the upcoming game and throughout the remainder of the season. Not only do the pregame meals provide essential nutrition for the players, but they also serve as a forum for the Bruins to maximize preparation time and conduct team business. See Mabley v. Commissioner, 1965 Tax Ct. Memo LEXIS 6, at *12 (concluding

that a rented hotel suite constituted business premises because the hotel suite in which the meals were furnished was acquired and actually used for the conduct of business of the company.).  Like the meals provided in Mabley, the pregame meals are mandatory for players (excepting the snack) and provide an opportunity for Bruins' players to meet with coaches to strategize and review game film.  The Bruins' public relations staff uses this time to prepare players for upcoming interviews and other public-facing issues.  It is also a time when the players meet with staff to receive tickets for family and friends.  Coaches, trainers, and management also use meal time to meet amongst themselves and make roster adjustments for a variety of reasons.

Aside from the meal room, the Bruins use other areas in the away city hotels for preparation.  Athletic trainers use hotel space to provide players with medical treatment, physical therapy, and massages.  Players use hotel fitness centers for strength and conditioning sessions, which help decrease the chance of injury and maximize athletic performance.  Given the nature of the NHL and the Bruins' game schedule, we see no way that the team's traveling hockey employees could perform all these necessary functions exclusively in Boston.  The evidence at trial also establishes that the Bruins could not perform all these activities at the opponent's arena because of limited access and insufficient space and facilities.

We thus conclude that away city hotels are vital to the Bruins' business objective of winning hockey games and are where a significant portion of the traveling hockey employees' responsibilities and the Bruins' business is conducted. See Vanicek v. Commissioner, 85 T.C. at 740; Mabley v. Commissioner, 1965 Tax Ct. Memo LEXIS 6, at *12. Accordingly, we hold that the away city hotels constituted part of the Bruins' business premises for the years in issue.

Respondent acknowledges that the Bruins perform business activities at away city hotels; however, respondent argues that the traveling hockey employees' activities at away city hotels are insignificant because: (1) the activities at away city hotels are qualitatively less important than playing in the actual hockey game and (2) the Bruins spend quantitatively less time at each away city hotel than they do at the team's Boston facilities. Although we agree with respondent that playing in hockey games is important to the Bruins' business, it seems that the quality of play is directly related to the team's preparation. This preparation includes business activities that occur at away city hotels, such as: eating nutritious meals, obtaining adequate rest, meeting with coaches individually or in small groups to strategize, reviewing game film, receiving athletic treatments and massages, and completing strength and conditioning workouts. The evidence at trial further indicates that the strength and conditioning workouts performed by the players at

away city hotels provide important benefits to the players, not just for the immediate game but throughout the remainder of the season. Without the preparatory activities that occur at away city hotels the Bruins' performance during games would likely be adversely affected. Furthermore, respondent provides no precedent to support the argument that business premises are limited to the location where the most qualitatively significant business activity occurs.

We also disagree with respondent's argument that away city hotels cannot constitute the Bruins' business premises because the team spends quantitatively less time at each individual away city hotel when compared to the team's time spent at its Boston facilities. Although the Bruins do spend quantitatively less time at each individual away city hotel than they do in Boston, this goes to the unique nature of a professional hockey team that is required to play one-half of its games away from home. It is therefore illogical for respondent to ignore the nature of the Bruins' business and the NHL and analyze the amount of time spent at each away city hotel in isolation. See Vanicek v. Commissioner, 85 T.C. at 739-740; Lindeman v. Commissioner, 60 T.C. at 615. Respondent also provides no precedent to support the proposition that a quantitative comparison of time is critical to determining business premises. See Adams, 585 F.2d at 1066 (stating that determinations of business premises "limited to the geographic contiguity of

the premises or to questions of the quantum of business activities on the premises are too restrictive"). Accordingly, we hold that the away city hotels constituted part of the Bruins' business premises for the years in issue.

### D. Revenue/Operating Cost Test

For employee meals at an employer-operated eating facility to qualify as a de minimis fringe, section 132(e)(2)(B) requires that revenue derived from the employer-operated eating facility equal or exceed the direct operating costs of the facility (i.e., the revenue/operating cost test). Section 132(e) provides that "an employee entitled under section 119 to exclude the value of a meal provided at such facility shall be treated as having paid an amount for such meal equal to the direct operating costs of the facility attributable to such meal." Regulations provide that an employer-operated eating facility satisfies the revenue/operating cost test if the employer can reasonably determine that the meals are excludable to the recipient employees under section 119. Boyd Gaming Corp. v. Commissioner, 106 T.C. at 353; sec. 1.132-7(a)(2), Income Tax Regs. Meals are excludable to recipient employees under section 119 if they are (1) furnished for the convenience of the employer and (2) furnished on the business premises of the employer. Sec. 119(a).

Whether meals are furnished for the convenience of the employer is a question of fact to be determined by an analysis of all the facts and circumstances. Sec. 1.119-1(a)(1), Income Tax Regs. Meals furnished without charge to the employee will be considered for the convenience of the employer if the meals are furnished "for a substantial noncompensatory business reason of the employer." Sec. 1.119-1(a)(2)(i), Income Tax Regs. In making this determination we are guided by section 1.119-1(a)(2)(ii), Income Tax Regs., which lists examples of substantial noncompensatory business reasons. See Boyd Gaming Corp. v. Commissioner, 106 T.C. at 349. We further remain cognizant that, if a taxpayer provides credible and uncontradicted evidence of business reasoning, the Court will refrain from second-guessing a taxpayer's business judgment. Boyd Gaming Corp. v. Commissioner, 177 F.3d 1096, 1100-1101 (9th Cir. 1999), rev'g T.C. Memo. 1997-445.

The evidence establishes that the pregame meals at away city hotels are provided to the Bruins' traveling hockey employees for substantial noncompensatory business reasons. The Bruins provide pregame meals to traveling hockey employees at away city hotels first and foremost for nutritional and performance reasons. Meals are selected by the Bruins to meet the exacting nutritional needs of professional athletes, and menus are kept consistent from city

to city to avoid players' experiencing unexpected gastric problems during games. The Bruins also provide pregame meals to the traveling hockey employees at away city hotels because they are subject to a busy schedule and have only limited time to prepare for an upcoming game. The Bruins play 82 regular season games, which include 41 away games at locations throughout the United States and Canada. The record establishes that the traveling hockey employees arrive at away city hotels the day before the game (or sometimes the morning of the game) and spend most of their time with preparation activities, such as: ensuring players get adequate rest; reviewing game film, strategizing, and making roster adjustments; conducting player-coach meetings; preparing for public relations inquiries; providing remedial or preventative athletic treatments; and completing strength and conditioning workouts to maintain player health and optimize performance. Providing meals to traveling hockey employees at away city hotels enables the Bruins to effectively manage a hectic schedule by minimizing unproductive time (e.g., finding and obtaining appropriate meals from restaurants in each city) and maximizing time dedicated to activities that help achieve the organization's goal of winning hockey games. Petitioners have provided credible evidence establishing the business reasons for furnishing pregame meals to

traveling hockey employees at away city hotels, and we will not second-guess their business judgment. See id.

Because we concluded supra p. 23 that the away city hotels were the business premises of the Bruins, we need not repeat our discussion here. Accordingly, we hold that petitioners' provision of meals at away city hotels is for the convenience of the employer under section 119 and therefore satisfies the revenue/operating cost test of section 132(e)(2)(B).

E.  Meals Furnished During, Before, or After Employee's Workday

Section 1.132-7(a)(2)(iv), Income Tax Regs., provides that the "meals furnished at the facility are provided during, or immediately before or after, the employee's workday." Respondent concedes that petitioners have satisfied this requirement.

We conclude that petitioners' provision of pregame meals and snacks to the traveling hockey employees at away city hotels qualifies as a de minimis fringe pursuant to section 274(n)(2)(B). Accordingly, petitioners are entitled to deduct the full cost of the meals without regard to the 50% limitation imposed by section 274(n)(1).

## II.  Entertainment Exception

Section 274(e)(8) exempts from the 50% limitation of section 274(n)(1) "[e]xpenses for goods or services (including the use of facilities) which are sold by the taxpayer in a bona fide transaction for an adequate and full consideration in money or money's worth."  Section 1.274-2(f)(2)(ix), Income Tax Regs., provides that this exception applies to "[a]ny expenditure by a taxpayer for entertainment * * * to the extent the entertainment is sold to customers in a bona fide transaction for an adequate and full consideration in money".  Petitioners argue that "[t]he cost of the meals that the Bruins provide to their players is part of the expenses that they incur to provide hockey entertainment to their fans" and therefore meets this exception.  Because, as previously decided supra part I, the Bruins' provision of meals to their traveling hockey employees at away city hotels satisfies the de minimis fringe exception of section 274(n)(2)(B), we need not address petitioners' alternative argument concerning the application of section 274(e)(8).

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

An appropriate order will be issued denying respondent's motion, and decision will be entered for petitioners.